<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

DEIDRA    JACOBS,    DENNIS    LUBRIN,
JACQUELINE JACK, and LUANNE RAZON,
individually  and  behalf  of  all  other  similarly
situated,

          Plaintiffs,

          v.

HACKENSACK MERIDIAN HEALTH, INC.,

          Defendant.

No. 25cv1272 (EP) (CF)

**OPINION**

**PADIN, District Judge.**

Plaintiffs Deidra Jacobs, Dennis Lubrin, Jacqueline Jack, and Luanne Razon are all current or former participants in at least one of the following retirement plans sponsored by Defendant Hackensack Meridian Health, Inc. ("Defendant" or "HMH"):  (1) the Consolidated 403(b) Plan of HMH (the "403(b) Plan"); (2) the HMH 401(k) Savings Plan (the "401(k) Plan"); and (3) the Consolidated Defined Contribution Plan of HMH (the "Defined Contribution Plan") (collectively, the "Plans").

Collectively, and on behalf of all others similarly situated, Plaintiffs bring a putative class action pursuant §§ 1109 and 1132 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.  D.E. 1 ("Complaint" or "Compl.").  Plaintiffs allege that Defendant, as a fiduciary of the Plans, breached its duties of loyalty and prudence by: (1) offering and allowing substantial assets in the Plans to be invested in the TIAA Stable Value Fund ("TIAA SVF")—an underperforming investment option; and (2) failing to pay reasonable recordkeeping and administration fees ("RKA") services for the Plans.  *Id.* ¶¶ 21-22.  Based on

this conduct, Plaintiffs bring a one-count Complaint against Defendant for breaching its fiduciary duty of prudence. *Id.* ¶ 23.

Defendant moves to dismiss the Complaint. D.E. 24-1 ("Motion" or "Mot.").[1]  Plaintiffs oppose the Motion, D.E. 33 ("Opposition" or "Opp'n"), and Defendant replies, D.E. 36 ("Reply"). While the parties were briefing the Motion, the Stable Value Investment Association ("SVIA") filed a motion for leave to file an amicus brief. D.E. 30 ("Amicus Motion").[2]  Plaintiffs oppose the Amicus Motion. D.E. 34 ("Amicus Opposition" or "Amicus Opp'n").

The Court decides both motions without oral argument. *See* Fed. R. Civ. P. 78; L. Civ. R. 78.1(b). For the reasons explained below, the Court will **GRANT** the Amicus Motion[3] and **GRANT in part** and **DENY in part** Defendant's Motion.

---

[1] For ease of reference, the Court refers to Defendant's brief in support of its Motion as its Motion. The Notice of Motion is filed at D.E. 24.

[2] The SVIA's proposed amicus brief is filed at D.E. 30-1, which the Court refers to as the SVIA's "Amicus Brief" or "Amicus Br."

[3] A court will grant an amicus leave to file a brief when "(1) the amicus has a 'special interest' in the particular case; (2) the amicus' interest is not represented competently or at all in the case; (3) the proffered information is timely and useful; and (4) the amicus is not partial to a particular outcome in the case." *United States v. Alkaabi*, 223 F. Supp. 2d 583, 592 (D.N.J. 2002). "Whether to do so is 'within the broad discretion of the district court.'" *In re Axon VieVu Antitrust Litig.*, No. 23-7182, 2025 WL 366751, at *9 (D.N.J. Jan. 31, 2025) (quoting *Granillo v. FCA US, LLC*, No. 16-153, 2018 WL 4676057, at *4 (D.N.J. Sept. 28, 2018) (citation modified)).

Over Plaintiffs' objection, the Court will **GRANT** the SVIA's Amicus Motion. Both the SVIA and Plaintiffs include several citations to cases where courts have granted or denied amicus motions in nearly identical circumstances. *See* Amicus Mot. at 4 & n.2; Amicus Opp'n at 2-3. The Court recognizes that courts across the country disagree on the utility and appropriateness of amicus briefs in similar actions to the present. Nevertheless, the Court finds that the SVIA—a non-profit organization and thought leader in the stable value landscape—has a special interest that is unique from Defendant's. Additionally, the SVIA can offer the Court helpful context on the broader stable value fund landscape, including the various types of stable value funds and why a fiduciary might select one fund over another. And, as explored in more depth below, Plaintiffs

2

## I.    BACKGROUND

### A.    Factual Background[4]

#### 1.    The Plans

The Plans are each defined contribution retirement plans established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA.  Compl. ¶ 2; *see id.* ¶ 45 (defining defined contribution plans).  As defined contribution plans, the Plans enable eligible participants to make tax-deferred contributions from their salaries.  *Id.* ¶ 2.

The relevant time period for Plaintiffs' allegations—the "Class Period"—is 2019 to 2023. *Id.* ¶ 11.  During the Class Period, the Plans had well over a billion dollars in assets under management ("AUM") among them.  *Id.*  At the start of the Class Period, the 403(b) Plan had $1.7

---

argue that several cases that Defendant relies on are inapposite because they analyze breaches of the fiduciary duty of prudence involving non-stable value products.  *See* Opp'n at 18-19 & 23-29. The SVIA's Amicus Brief will aid in Court in understanding the broader stable value fund market as the Court evaluates the merit of Plaintiffs' position.

[4] For purposes of the Motion, the Court relies on the Complaint and the attachments thereto, and draws all inferences in the light most favorable to Plaintiffs.  *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).  However, "the Court need not accept as true allegations that are directly contradicted by indisputably authentic documents on which the complaint relies." *Sourovelis v. City of Philadelphia*, 246 F. Supp. 3d 1058, 1075 (E.D. Pa. 2017) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir. 1993)).  Moreover, the Court may rely on "document[s] integral to or explicitly relied upon in the complaint . . . without converting the motion to dismiss into one for summary judgment.'" *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).  This has also been extended to excerpts from documents included in the complaint, but which themselves are not attached in full.  *See Ruggiero v. Mount Nittany Med. Ctr.*, 736 F. App'x 35, 37 n.1 (3d Cir. 2018) (citing *id.*).

Relevant here, the Court relies on facts incorporated into the Complaint including from Form 5500 Annual Reports ("Form 5500s") filed with the Department of Labor and Treasury Department for the alleged comparators in the Complaint as well as other documents attached to Defendant's Motion of which excerpts are included in the Complaint.  The Third Circuit has confirmed that when no party disputes these documents' authenticity and where allegations in the complaint are based on them, the Court can rely on them to asses a motion to dismiss.  *Mator v. Wesco Dist., Inc.*, 102 F.4th 172, 179 (3d Cir. 2024) (citation omitted).

3

billion dollars in AUM, the 401(k) Plan had $257 million dollars in AUM, and the Defined Contribution Plan had $258 million dollars in AUM. *Id.* ¶ 11. Thus, collectively, the Plans had over $2.2 billion in AUM. *Id.* By 2023, the Plans grew to have over $3.5 billion in combined AUM. *Id.* ¶ 12. The 403(b) Plan had over $1.7 billion in AUM, the 401(k) Plan grew to have over $1.6 billion in AUM, and the Defined Contribution Plan had $275,709,669 in AUM. *Id.*

The Plans were also large in terms of the number of their participants. At the beginning of the Class Period, the 403(b) Plan had 8,736 participants, the 401(k) Plan had 29,798 participants, and the Defined Contribution Plan had 7,543 participants. *Id.* ¶ 15. By 2023, the 403(b) Plan had 23,667 participants, the 401(k) Plan had 47,160 participants, and the Defined Contribution Plan had 11,023 participants. *Id.*

### 2. *Defendant and its duties under ERISA*

Defendant is the sponsor of the Plans. *Id.* ¶ 35 (citations omitted). Plaintiff alleges that Defendant is a fiduciary of the Plans. *Id.* ¶ 36.

To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties upon employers and other plan fiduciaries. *Id.* ¶ 3. Among those is the duty of prudence. 29 U.S.C. § 1104(a)(1)(A)–(B).

The duty of prudence commands a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(1)(B). A fiduciary must also "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries; and . . . defraying reasonable expenses of administering the plan." *Id.* § 1104(a)(1)(A).

"In addition to the prudent man standard, fiduciaries are required to diversify investments unless it would be imprudent, and to administer the plan according to governing documents and instruments." *Fumich v. Novo Nordisk Inc.*, No. 24-9158, 2025 WL 2399134, at *4 (D.N.J. Aug. 19, 2025) (citing *id.* § 1104(a)(1)(C), (D)). Fiduciaries are personally liable for losses due to breach. *Id.* (citing 29 U.S.C. § 1109(a)).

### 3. Background on stable value funds

Stable value funds "are intended to provide participants with an option that protects their assets and is shielded from risks of loss, hence why they are called Guaranteed Investment Contracts or 'GICs.'"[5] Compl. ¶ 80; *see* Amicus Br. at 5 (explaining that stable value "investments are meant to prioritize stability and asset preservation together with positive, low-volatility returns over a long-term investment horizon, not short-term growth at all cost"). GICs are issued by insurance companies in the form of a fixed annuity contract, and pursuant to the terms of those contracts, the GICs provide for a guaranteed rate of return or "crediting rate" during a specified time period. Compl. ¶ 81. There are three types of stable value investments: "synthetic GICs," "separate account GICs," and "general account GICs." *Id.* ¶¶ 82-85.

Large plans often offer "synthetic GICs[,] which are the least risky, because principal is guaranteed by multiple wrap providers and the fund owns the assets of the underlying funds." *Id.* ¶ 82 (citation modified).

For separate account GICs, the assets of the underlying funds are held in the separate account of an insurance carrier. *Id.* ¶ 83. Because there is only one wrap provider, separate account GICs are riskier than synthetic GICs. *Id.* Plus, "for separate account GICs, the insurer's payment obligations are putatively backed by a separate account, which is less susceptible to claims and

---

[5] Throughout this Opinion, the Court uses the terms "stable value fund" and "GIC" interchangeably.

liabilities against the insurer.  As a result, separate account GICs offer higher crediting rates" than synthetic GICs.  *Id.*

General account GICs are the riskiest type of stable value fund.  *Id.* ¶ 84.  This is because the funds are held unrestricted in the general account of the insurance carrier and are more vulnerable to single entity credit risk.  *Id.*  Put another way, "the insurer is the sole entity responsible for paying such funds," and "if the insurer fails to pay funds, no other entity will satisfy the loan."  *Id.* ¶ 85.  Accordingly, general account GICs offer the highest crediting rates of all stable value funds.  *Id.* ¶ 84.

> 4.    *Defendant's alleged failure to monitor the Plans' stable value fund*

One investment option available to participants in the Plans was the TIAA SVF.  *Id.* ¶ 93. Plaintiffs allege that the TIAA SVF was a general account GIC, *id.* ¶ 84, but it appears to be a separate account GIC, *see* D.E. 24-1, Ex. A at 2[6] ("TIAA [SVF] is a separate-account-based fixed annuity providing capital preservation and income . . . .").[7]  At the same time the TIAA SVF was available, "identical or substantially similar stable value funds" with higher crediting rates were also available, but Defendant did not select those better-performing plans to be included in the Plans.  *Id.*  Defendant allegedly violated its fiduciary duty of prudence by allowing substantial assets in the Plans to be invested in the TIAA SVF instead of other stable value funds with higher crediting rates.  *Id.* ¶¶ 17-18, 90-92.

Plaintiffs include several charts in the Complaint to support their claims.  *See id.* ¶¶ 92, 94, 96, 98.  Plaintiffs first compare the TIAA SVF to TIAA's Retirement Choice Plus Annuity (herein,

---

[6] The Court uses the page numbers automatically generated by CM/ECF.

[7] *See supra* n.4 for the Court's basis for relying on this GIC comparison chart attached to Defendant's Motion and from which an excerpt is embedded within paragraph 93 of the Complaint.

the "TIAA RCP") —another stable value fund offered by TIAA—which Plaintiffs allege is most similar to the TIAA SVF based on the amount of liquidity in the funds. *Id.* ¶ 94. Other than the TIAA RCP's liquidity and its holdings, *see id.* ¶ 93, the Complaint contains no other information about the TIAA RCP.[8]

In three charts—one for each Plan—Plaintiffs compare the gap in crediting rates between the TIAA SVF and the TIAA RCP during the Class Period:

**401(k) Plan**

| Year | Fund in Plan | Asset Amount in Fund | Plan Crediting Rate | TIAA RCP Crediting Rate |
|------|--------------|----------------------|---------------------|--------------------------|
| 2019 | TIAA Stable Value | $11,767,484 | 1.15% | 3.60% |
| 2020 | TIAA Stable Value | $31,029,789 | 1.50% | 3.15% |
| 2021 | TIAA Stable Value | $44,273,999 | 1.94% | 3.15% |
| 2022 | TIAA Stable Value | $65,963,311 | 1.75% | 4.50% |
| 2023 | TIAA Stable Value | $83,685,415 | 2.35% | 5.75% |

**403(b) Plan**

| Year | Fund in Plan | Asset Amount in Fund | Plan Crediting Rate | TIAA RCP Crediting Rate |
|------|--------------|----------------------|---------------------|--------------------------|
| 2019 | TIAA Stable Value | $27,150,246 | 2.25% | 3.60% |
| 2020 | TIAA Stable Value | $182,143,370 | 2.06% | 3.15% |
| 2021 | TIAA Stable Value | $172,436,957 | 2.48% | 3.15% |
| 2022 | TIAA Stable Value | $177,275,737 | 2.06% | 4.50% |
| 2023 | TIAA Stable Value | $165,373,764 | 2.62% | 5.75% |

---

[8] The TIAA RCP is a general account stable value fund. *See* D.E. 24-1, Ex. A at 3.

**Defined Contribution Plan**

| Year | Fund in Plan | Asset Amount in Fund | Plan Crediting Rate | TIAA RCP Crediting Rate |
|------|--------------|----------------------|---------------------|-------------------------|
| 2019 | TIAA Stable Value | $1,283,221 | 1.95% | 3.60% |
| 2020 | TIAA Stable Value | $26,275,180 | 2.13% | 3.15% |
| 2021 | TIAA Stable Value | $25,227,871 | 2.29% | 3.15% |
| 2022 | TIAA Stable Value | $24,640,428 | 2.13% | 4.50% |
| 2023 | TIAA Stable Value | $23,839,485 | 2.56% | 5.75% |

*Id.* ¶ 94.  Per Plaintiffs, these charts demonstrate that the TIAA SVF had a significantly lower crediting rate than the TIAA RCP, which resulted in tens of millions of dollars in losses to the Plans and their participants during the Class Period.  *Id.* ¶ 97.

Plaintiffs further allege that the crediting rate for the TIAA SVF was also meaningfully below that of stable value funds offered by comparable carriers in other retirement plans.  *Id.* ¶ 98. To support that allegation, Plaintiffs compare the crediting rate for the TIAA SVF to the crediting rate for the Lincoln Stable Value Account (herein, the "Lincoln SVF") in several retirement plans. *See id.* (charts omitted).  Other than the crediting rates of the Lincoln SVF in several retirement plans during the Class Period, the Complaint contains no other information about the Lincoln SVF.[9]

---

[9] For example, the Complaint contains no allegations classifying the Lincoln SVF as a synthetic, separate account, or general account GIC.  After reviewing a Form 5500 submitted by Defendant, it appears that the Lincoln SVF is a general account GIC.  *See* D.E. 24-1, Ex. F at 24 ("Lincoln National maintains the contributions in a general account.").

In Opposition, Plaintiffs note that "courts routinely refuse to accept the defendants' 'own analysis of Form 5500 materials' because the 'arguments raise factual and legal disputes which cannot be

In sum, Plaintiffs allege that a prudent fiduciary would not have included the TIAA SVF—an "underperforming investment option that also carried significantly more risk than other investment options," Compl. ¶ 19—and "would have known that TIAA or other providers of fixed annuities offer substantially identical, better-performing stable value investments," *id.* ¶ 100. Moreover, "a prudent fiduciary could have accomplished this goal by demanding higher crediting rates from TIAA and/or by submitting requests for proposals to TIAA and other providers of stable value investments." *Id.*

      5.      *Background on RKA services and fees*

As explained in the Complaint, "the term 'recordkeeping' is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's 'recordkeeper.'" *Id.* ¶ 110. There are primarily two types of essential RKA services provided by recordkeepers for large plans like the Plans: (1) "an overall suite of recordkeeping services" that is provided as "part of a 'bundled' fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an 'all-you-can-eat' basis)"; and (2) "a la carte" services, which are separate and require additional fees, and which are based on the conduct of individual participants. *Id.* ¶¶ 111-13. The "a la carte" fees are distinct from the "all-you-can-eat" bundled arrangements so that "one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance." *Id.* ¶ 113.

---

resolved at this stage.'" Opp'n at 13 (quoting *Daggett v. Waters Corp.*, 731 F. Supp. 3d 121, 136-37 (D. Mass. 2024)). To the extent that Plaintiffs suggest that a stable value fund's classification as a synthetic, separate account, or general account fund is an interpretation of a Form 5500, the Court disagrees. The cases Plaintiffs cite to concern differing analyses of formulas and calculations used by the parties, rather than basic information provided within those forms, such as the information relied on here.

      6.    *RKA allegations*

The marketplace for retirement plan services is competitive, and therefore, as "jumbo plans," the Plans had substantial bargaining power to obtain high-quality and low cost RKA services. *Id.* ¶¶ 13-16; *see id.* ¶ 115 (explaining that plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee); *see id.* ¶ 140 (noting that because administrative costs are substantially reduced per capita as plan sizes increase, "the larger the plan, the lower the recordkeeping fee should be" (citations omitted)). Yet, despite possessing significant bargaining power, Defendant "did not try to reduce the Plans' expenses to ensure they were prudent. Rather, Defendant allowed unreasonable expenses to be charged to participants for RKA services." *Id.* ¶ 16. Defendant's conduct was "especially egregious given that the Plans' recordkeeper, TIAA, received additional income from the Plans' stable value funds," which were "clearly unreasonable." *Id.*

A plan's fiduciaries "must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available," something that can be accomplished by conducting a request for proposal ("RFP"). *Id.* ¶ 119. According to Plaintiffs, an RFP should take place at least every three to five years, and more frequently if a plan experiences an increase in RKA costs or fee benchmarking that reveals the recordkeeper's compensation exceeds levels found in similar plans. *Id.* ¶ 120 (citations omitted).

Relying on circumstantial facts and other evidence from forms filed with the Department of Labor, Plaintiffs allege that the Plans paid unreasonable RKA fees and/or that Defendant failed to engage in a prudent process to evaluate RKA fees. *Id.* § D.

Plaintiffs initially note that the Plans' recordkeeping agreement in effect during the Class Period shows that TIAA was not providing any RKA services beyond the "all-you-can-eat"

services when it charged plan participants a base fee of $45 per participant. *Id.* ¶¶ 125, 127, 139. Plaintiffs allege that this $45 fee was "unreasonable." *Id.* ¶ 140.

Plaintiffs then make two separate claims: (1) the RKA fees were unreasonable when benchmarked against similarly situated plans, *id.* ¶¶ 137-49; and (2) there is no indication that Defendant negotiated during the Class Period to reduce the Plans' RKA fees, *id.* ¶¶ 132-36.

With respect to the former, Plaintiffs include a chart comparing the RKA costs in the Plans to thirty-five plans similar in size to the Plans when combined (in terms of both AUM and number of participants). *Id.* ¶ 142 (chart omitted). That chart shows the comparable plans had costs per participant as low as $9, and averaged a per participant fee of $26 during the Class Period. *Id.* ¶¶ 142, 144. Therefore, the Plans' $45 per participant fee, which was almost double the average, suggests that the Plans could have obtained significantly lower participants fees—certainly no more than $26 per participant. *Id.* ¶¶ 143, 145-46.

Plaintiffs also allege that based on the high RKA fees paid by Plan participants compared to similar plans that "there is little to suggest that Defendant conducted an RFP, or at least an effective one, at reasonable intervals to determine whether the Plans could obtain better [RKA] pricing from other service providers given that the market for recordkeeping is highly competitive." *Id.* ¶ 134. Indeed, had Defendant "genuinely sought a competitive rate, the participants in the Plans would have benefited from a significant reduction in RKA costs." *Id.* ¶ 136. Defendant's failure to do so was a breach of its duty of prudence. *See id.* ¶¶ 150-56.

       7.    *Plaintiff-specific allegations*

Plaintiffs include the following allegations concerning each of the named Plaintiffs:

- Plaintiff Deidra Jacobs participated in the 401(k) Plan. *Id.* ¶ 27. Ms. Jacobs invested in the TIAA SVF in the 401(k) Plan and suffered injury to her Plan account "due to the

significant underperformance of the TIAA GIC." *Id.* In addition, she suffered injury to her Plan account by overpaying for her share of RKA costs. *Id.*

- Like Ms. Jacobs, Plaintiff Dennis Lubrin participated in the 401(k) Plan and suffered injury to his Plan account when he invested in the TIAA SVF. *Id.* ¶ 28. He also suffered injury to his Plan account by overpaying for his share of RKA costs. *Id.*

- Plaintiff Jacqueline Jack participated in the Defined Contribution Plan. *Id.* ¶ 29. She suffered injury to her Plan account by overpaying for her share of RKA costs. *Id.* She is not alleged to have invested in the TIAA SVF. *See id.*

- Plaintiff Luanne Razon participated in the 403(b) Plan and the 401(k) Plan. *Id.* ¶ 30. She, like Mr. Lubrin and Ms. Jacobs, invested in the TIAA SVF in the 401(k) Plan and suffered injury to her Plan account due to this investment. *Id.* She also suffered injury to her Plan account by overpaying for her share of RKA costs. *Id.*

**B.      Procedural History**

Plaintiffs commenced this action on February 14, 2025. Compl. The Complaint contains one count for breach of Defendant's fiduciary duty of prudence imposed by ERISA § 1104(a). *Id.* ¶¶ 150-56. After the parties filed pre-motion letters and the Court forwent a pre-motion conference, D.Es. 11-12 & 16, the parties briefed this Motion.

**II.      LEGAL STANDARDS**

**A.      Motions to Dismiss**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a court accepts all well-pled factual allegations as true, construes the complaint in the plaintiff's favor, and determines "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Cnty. of Allegheny*, 515 F.3d at 233 (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In

other words, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

"In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Courts may not consider "[f]actual claims and assertions raised by a defendant." *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

To survive a Rule 12(b)(6) challenge, a plaintiff's claims must be facially plausible, meaning that "the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Although there is no "probability requirement," a plaintiff's claims must do more than present "a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). The allegations must amount to "more than labels and conclusions." *Twombly*, 550 U.S. at 555.

Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Essentially, "the allegations must move the claim 'from conceivable to *plausible*.'" *Mator*, 102 F.4th at 189 (quoting *Twombly*, 550 U.S. at 570) (emphasis added in *Mator*).

13

**B.        Motions to Dismiss Under ERISA**

The Third Circuit recently reiterated that "evaluating plausibility" under *Twombly* and *Iqbal* in the ERISA context "requires a context-specific inquiry that includes the underlying substantive law." *Kruchten v. Ricoh USA, Inc.*, No. 23-1928, 2024 WL 3518308, at *2 (3d Cir. July 24, 2024) (citing *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 327 (3d Cir. 2019)[10]).

> Under ERISA, fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope, 29 U.S.C. § 1104(a)(1)(B). When reading complaints, we look holistically across all of the allegations to see if the complaint plausibly alleges the fiduciary violated its duties. *Sweda*, 923 F.3d at 331 (explaining that we must not "pars[e ERISA complaints] piece by piece to determine whether each allegation, in isolation, is plausible") (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)). At the same time, we must "give due regard to the range of reasonable judgments a fiduciary may make based on [its] experience and expertise." [*Hughes*, 595 U.S. at 177].
>
> Retirement plan participants can state an ERISA claim if the fiduciary charges excessive fees, fails proactively to solicit bids, or fails to use its market power to bargain for lower fees. *Sweda*, 923 F.3d at 328-29. [RKA] services fees can be considered excessive based on factual comparisons to other similar plans. *Mator*, 102 F.4th at 185. For example, the *Mator* plaintiffs compiled a table of [RKA] services fees paid by other plans that showed their plan paid fees several times more than what similar plans paid. *Id.* at 180. This factual context suggested that the plan administrator had failed to act prudently and accordingly "nudge[d] the . . . claims across the line from possible to plausible." *Id.* at 186.

*Kruchten*, 2024 WL 3518308, at *2-3 (emphasis removed).

---

[10] In *Sweda*, the Third Circuit held that "*Twombly*'s discussion of alleged misconduct that is 'just as much in line with a wide swath of rational and competitive business strategy' is specific to antitrust cases." 923 F.3d at 326 (quoting *Twombly*, 550 U.S. at 554). As recognized by the Third Circuit in *Mator*, the Supreme Court "abrogated that specific portion of *Sweda* by reiterating that in ERISA cases, courts are to 'apply the pleading standard discussed in [*Iqbal*] and [*Twombly*].'" 102 F.4th at 184 n.3 (quoting *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022)). *Sweda* remains good law otherwise.

Whether a defendant breached its duty of prudence is primarily a question of fact. *Schultz v. Aerotech, Inc.*, No. 24-618, 2025 WL 563585, at *7 (W.D. Pa. Feb. 20, 2025); *see Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 541 F. Supp. 3d 496, 510-11 (D.N.J. 2021) ("Although hindsight cannot play a role in determining whether a fiduciary's actions were prudent, many allegations concerning fiduciary conduct are factual questions not properly addressed at the motion to dismiss stage." (citations omitted)). Indeed,

> [a] well pled allegation . . . must be taken as true at this stage of the case. *See Mator*, 102 F.4th at 186 (taking as true the allegation that the [RKA] services market is competitive, and therefore different recordkeepers must provide similar services); *Braden* 588 F.3d at 595 (crediting plaintiff's inference that, due to the competitive nature of the retirement plan market, a large plan could use its bargaining power to obtain access to institutional investment products); *Hughes v. Nw. Univ.* (*Hughes II*), 63 F.4th 615, 632 (7th Cir. 2023) (accepting the allegation that "recordkeeping services are fungible and that the market for them is highly competitive").

*Kruchten*, 2024 WL 3518308, at *3. "A claim is plausible on its face 'when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* at *2 (quoting *Sweda*, 923 F.3d at 325).

This is not to say that no facts may be evualted at the motion to dismiss stage. For example, in *Renfro v. Unisys Corp.*, the Third Circuit explained:

> [a]n ERISA defined contribution plan is designed to offer participants meaningful choices about how to invest their retirement savings. Accordingly, we hold the range of investment options and the characteristics of those included options—including the risk profiles, investment strategies, and associated fees—are highly relevant and readily ascertainable facts against which the plausibility of claims challenging the overall composition of a plan's mix and range of investment options should be measured.

671 F.3d 314, 327 (3d Cir. 2011). Following this guidance, district courts in this Circuit have reasoned that "an allegation that the services market is commodified and competitive is not a mere 'legal conclusion' that the courts must reject." *Schultz*, 2025 WL 563585, at *5 (quoting *Kruchten*,

2024 WL 3518308, at *3). Courts have also rejected proposed comparisons when the complaint lacks the information necessary to allow the Court to infer that the fiduciary made an imprudent choice to select the challenged fund at the outset. *See, e.g.*, *Fumich*, 2025 WL 2399134, at *5. At bottom, when considering a motion to dismiss a breach of a fiduciary's duty of prudence, the Court "employ[s] a holistic approach," considering all of the plaintiff's "well-pleaded factual allegations . . . to determine whether her allegations plausibly demonstrate entitlement to relief." *Sweda*, 923 F.3d at 331.

## IV.    ANALYSIS

"Congress enacted ERISA to protect 'employees and their dependents' whose 'well-being and security' was affected by 'the lack of . . . adequate safeguards' for employee benefit plans." *Fumich*, 2025 WL 2399134, at *4 (quoting 29 U.S.C. § 1001(a)). "ERISA entitles a participant in a defined contribution plan to 'the value of his account unencumbered by any fiduciary impropriety.'" *Mator*, 102 F.4th at 183 (quoting *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 297 (3d Cir. 2007)).

The crux of the Complaint is that Defendant breached its fiduciary duty of prudence under ERISA. To state that claim, Plaintiffs must plausibly allege that: "(1) a plan fiduciary (2) breache[d] an ERISA-imposed duty (3) causing a loss to the plan." *Barragan v. Honeywell Int'l Inc.*, No. 24-4529, 2024 WL 5165330, at *4 (D.N.J. Dec. 19, 2024) (quoting *Leckey v. Stefano*, 501 F.3d 212, 225-26 (3d Cir. 2007), *as amended* (Dec. 21, 2007)). Here, Plaintiffs allege Defendant, a fiduciary, breached its duty of prudence in two ways: (1) by failing to monitor the TIAA SVF, because, if they had monitored it, they would have discovered that substantially identical GICs with higher crediting rates were available and should have been offered in the Plans instead of the TIAA SVF; and (2) by failing to engage in a prudent process to evaluate RKA fees,

which led Plaintiffs (and other Plan participants) to pay unreasonable RKA fees. *See generally* Compl. These breaches allegedly caused millions in losses.

As in the myriad other cases addressing the same legal issues, the dispute here centers on the second element: whether Defendant breached its duty of prudence. As previewed *supra section* I.A.2, the duty of prudence "obligates ERISA fiduciaries to act with 'the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use.'" *Grink v. Virtua Health, Inc.*, No. 24-9919, 2025 WL 3485686, at *10 (D.N.J. Dec. 3, 2025) (quoting 29 U.S.C. § 1104(a)(1)(B)). This is an objective standard that focuses "not on investment results but on process—that is, whether the facts, assessed holistically, permit a reasonable inference that a fiduciary's decision-making process was deficient." *Id.* (citing *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)). The Court must focus on a fiduciary's conduct in arriving at an investment decision, not on the results of the investment decision, and "ask[] whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *In re Unisys Sav. Plan Litig.*, 74 F.3d at 434. As a result, courts routinely hold that "[h]indsight cannot be used to plead a breach of the duty of prudence." *Fumich*, 2025 WL 2399134, at *5 (citing *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 721 (2d Cir. 2013)); *see id.* (collecting cases).

Plaintiffs do not have any "actual knowledge of the specifics of Defendant's decision-making process with respect to the Plans, including Defendant's processes (and execution of such) for selecting, monitoring, and removing the Plan's investments" because that information is "solely within the possession of Defendant prior to discovery." Compl. ¶ 74 (citations omitted). Direct allegations of imprudence are not necessary. *Sweda*, 923 F.3d at 332. In lieu of direct

17

evidence, a plaintiff can "provide[] substantial circumstantial evidence from which the District Court [can] 'reasonably infer' that a breach had occurred." *Id.* at 333 (quoting *Pension Benefit Guar. Corp.*, 712 F.3d at 718). "Such allegations may include the 'reasonableness of fees' and 'practices of similarly situated fiduciaries.'" *Seibert v. Nokia of Am. Corp.*, No. 21-20478, 2023 WL 5035026, at *3 (D.N.J. Aug. 8, 2023) (quoting *Sweda*, 923 F.3d at 331). However, a plaintiff "need[s] to establish that the comparisons [it] provide[s] are appropriate." *Schultz*, 2025 WL 563585, at *5 (quoting *Kruchten*, 2024 WL 3518308, at *4).

As explained in more depth below, the Court will **GRANT in part** and **DENY in part** Defendant's Motion. Because the Court finds that Plaintiffs have adduced sufficient circumstantial evidence with respect to its RKA-based claims to survive a motion to dismiss but have not done the same for their failure to monitor claims, the Court will **DISMISS** Plaintiffs' claims that Defendant failed to monitor the TIAA SVF but allow Plaintiffs' RKA-based claims to **PROCEED**.

### A.    Failure to Monitor Claims

"A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Grink*, 2025 WL 3485686, at *10 (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 529-30 (2015)).

The parties vigorously dispute what a plaintiff is required to show to state a claim for its failure to monitor claims. In sum and substance, Defendant asserts that when taking the circumstantial evidence route to state a breach of fiduciary duty claim, a plaintiff "must . . . provide a sound basis for comparison – a meaningful benchmark – to show a prudent fiduciary in like circumstances would have selected a different fund." Mot. at 18 (quoting *Cho v. Prudential Ins. Co. of Am.*, No. 19-19886, 2021 WL 4438186, at *7 (D.N.J. Sept. 27, 2021)). Defendant then

18

argues that Plaintiffs fail to meet this standard.  Meanwhile, Plaintiffs maintain that the Third Circuit has never adopted a "meaningful benchmark" standard, and in fact, Circuit precedent makes clear that factual disputes about comparisons are premature at the motion to dismiss stage. Opp'n at 17 (first citing *Sweda*, 923 F.3d at 332; then citing *Mator*, 102 F.4th at 181, 187). Essentially, the parties dispute what facts (if any) a court can consider at this juncture of the case, and to what extent a plaintiff must show its proposed comparators are similar to the challenged fund to push a complaint past a motion to dismiss.

After giving the parties' arguments much consideration, the Court finds that Defendant has the better of them.  The Court reaches its decision after reviewing multiple Third Circuit cases, district court cases in the Third Circuit, and cases from other Courts of Appeals which the Third Circuit has endorsed and/or relied on.  For starters, the Third Circuit appears to have addressed whether a court can consider *any* facts at the motion to dismiss stage when it explicitly stated that "risk profiles, investment strategies, and associated fees . . . are highly relevant and readily ascertainable facts against which the plausibility of claims . . . should be measured." *Sweda*, 923 F.3d at 330 (quoting *Renfro*, 671 F.3d at 327).  The Third Circuit—albeit non-precedentially—has also applied the "meaningful benchmark" standard in the RKA context.  *See Krutchen*, 2024 WL 3518308, at *3 (finding that plaintiffs "established a meaningful benchmark to allege plausibly that Plan fees were excessive" by "compil[ing] a list of retirement plans and the [RKA] services fees they charged and explained why those other plans were comparable").

In addition, as Defendant highlights in its Reply,[11] the Third Circuit in *Mator* seemingly supported the notion that plaintiffs' plan comparators must be sufficiently similar to survive a motion to dismiss when it "agree[d] with [its] sister Circuits' articulation of the relevant law in

---

[11] Reply at 3, 9.

those cases." 102 F.4th at 188 (first citing *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278-79 (8th Cir. 2022); then citing *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1164-65 (6th Cir. 2022)). Both *Matousek* and *Smith* address a plaintiff's pleading requirements to sustain a claim for a breach of the fiduciary duty of prudence in the ERISA context. In the relevant portion of *Matousek*, the Eighth Circuit explained:

> [a] plaintiff typically clears the pleading bar by alleging enough facts to "*infer . . . that the process was flawed.*" [*Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 482 (8th Cir. 2020)] (quotation marks omitted). The key to nudging an inference of imprudence [over the plausibility line] is providing "a sound basis for comparison—a meaningful benchmark"—not just alleging that "costs are too high, or returns are too low." *Id.* at 484.

51 F.4th at 278. *Smith* confirms that "[b]ecause the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific." 37 F.4th at 1164-65 (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)). And, because "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs . . . courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Id.* at 1165 (quoting *Hughes*, 595 U.S. at 177).

This Court's understanding of what it can consider—and what a plaintiff must allege to survive a motion to dismiss—also aligns with other recent decisions in this District addressing the same issues. For example, another court in this District recently held that "[a]ssertions of imprudence based on allegations of investment underperformance must 'provide a sound basis for comparison—a meaningful benchmark—to show a prudent fiduciary in like circumstances would have selected a different fund [or course of action].'" *Grink*, 2025 WL 3485686, at *10 (quoting *Silva v. Evonik Corp.*, No. 20-2202, 2020 WL 12574912, at *5 (D.N.J. Dec. 30, 2020) (citation modified)). The *Grink* court, relying on *Mator*, noted that "benchmarks must be 'specific' and '*sufficiently similar to render the comparisons valid.*'" *Id.* (emphasis added in *Grink*) (quoting

20

*Mator*, 102 F.4th at 188); *see Cho*, 2021 WL 4438186, at *8 n.7 ("Comparing apples and oranges is not a way to show" a meaningful benchmark such "that one [investment] is better or worse than the other.").

The Court is not persuaded by Plaintiffs' arguments to the contrary. Opp'n at 17-18, 27-39. Generally speaking, Plaintiffs' assertions that it need not establish a meaningful benchmark and that disagreements over fund comparators are not up for consideration at the motion to dismiss stage amount to an overgeneralized and inaccurate portrayal of Third Circuit law. *Id.* at 29-39. The Third Circuit rejected that argument (in the RKA context) when it instructed that "the lesson from *Mator* is that plaintiffs need to establish that the comparisons they provide are appropriate. We believe Plaintiffs here satisfied this requirement with factual allegations showing how peer plans were indeed similar." *Kruchten*, 2024 WL 3518308, at *4. Plus, there are ample facts the Third Circuit has explicitly approved courts considering at this stage of the case. *See, e.g.*, *Renfro*, 671 F.3d at 327.[12]

While the Court appreciates Plaintiffs' position that certain factual disputes about fund comparators are not properly considered at the motion to dismiss stage—such as those advanced by defendants in cases like *Mator* which parsed the plaintiff's proposed comparators too granularly—Plaintiffs' position that "a claim may be stated at the pleading stage by comparing

---

[12] Relatedly, Plaintiffs at points misconstrue the law when they argue that a plaintiff need not put forth a meaningful benchmark to survive a motion to dismiss. For instance, Plaintiffs cite *Mator* for the proposition that the Third Circuit "refuse[s]" to adopt a meaningful benchmark standard. Opp'n at 29 (citing *Mator*, 102 F.4th at 181, 187). Page 181 of *Mator* is part of the opinion's factual background, and the Circuit on page 187 noted that "drawing bright lines would run counter to the required contextual analysis, so we do not adopt any rules limiting comparator size or requiring a specific number of comparators." 102 F.4th at 187. Taken within its context, the Third Circuit in *Mator* did not "refuse" to adopt a meaningful benchmark standard, but instead, declined to adopt a bright-line rule regarding comparators given the necessary context-dependent analysis courts must undertake.

alternatives in the marketplace" but that "factual disputes about those comparisons are premature" is untenable.  Opp'n at 17.  In that event, a plaintiff could use any better-performing fund as an alleged comparator to survive a motion to dismiss as long as they allege that those two funds are substantially similar.  *See Cho*, 2021 WL 4438186, at *9 ("[I]f a comparison to a *single* cheaper fund with 'similar investment styles' sufficed to create a reasonable inference of imprudence, ERISA plaintiffs could challenge any fund so long as they could identify *one* cheaper fund sharing some alleged similarities with the challenged fund.").  As explained above, a plaintiff's benchmarks must be specific and sufficiently similar to render the comparisons meaningful so that "the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Kruchten*, 2024 WL 3518308, at *2 (quoting *Sweda*, 923 F.3d at 325).  True, the Third Circuit has not explicitly used the terms "meaningful benchmark" to describe what a plaintiff must plead in this context, but it has endorsed that language used in cases from other Circuits and has allowed claims to survive a motion to dismiss when it found "the comparators are sufficiently similar" to the challenged plan.  *Id.* at *4.  A plaintiff must, at a minimum, "explain[] why those other plans were comparable" to the challenged fund, *Kruchten*, *id.* at *3, and allege enough facts that allow the Court to "reasonably infer that a breach had occurred," *Sweda*, 923 F.3d at 333 (citation modified).

Here, Plaintiffs have failed to raise an inference that Defendant breached its duty of prudence by failing to remove the TIAA SVF.  Driving the Court's conclusion is that Plaintiffs have chosen to make that claim by comparing the crediting rates of two general account GICs against the TIAA SVF, a separate account GIC, without providing the necessary context for the Court to ascertain whether that is a fair comparison to draw.  The Court finds *Cho* particularly instructive.  There, the parties disputed whether a plaintiff's comparison of an actively managed

fund to a passively managed fund constituted a meaningful benchmark that plausibly alleged that the defendants' selection of a particular fund in a retirement plan was imprudent. *Cho*, 2021 WL 4438186, at *8 n.7. The *Cho* court found it did not. While "the Court [did] not necessarily find that, as a matter of law, an actively managed fund can never be compared to a passively managed fund," it did "find that a plaintiff must plausibly establish that it is providing an apt comparator, and the manner in which a fund is managed is a relevant consideration." *Id.* (citing *Davis*, 960 F.3d at 484). The court in *Cho* held that the plaintiff's comparison of the challenged funds to a single corresponding fund alleged to have a "similar investment style" did "not constitute a meaningful benchmark and [was] insufficient to plausibly allege that the [the defendants'] selection and retention of the challenged funds was imprudent." *Id.* at *8. In doing so, the court adopted the reasoning of the Eighth Circuit in *Meiners v. Wells Fargo & Co.*, which explained that "[t]he fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [challenged funds] were an imprudent choice at the outset." *Id.* (quoting 898 F.3d 820, 824 (8th Cir. 2018)).[13]

The same is true here. Plaintiffs compare the TIAA SVF to the TIAA RCP and Lincoln SVF—*i.e.*, Plaintiffs ask the Court to infer that Defendant breached its duty of prudence by failing to remove the TIAA SVF (a separate account GIC) from the circumstantial evidence that two

---

[13] Plaintiffs' efforts to distinguish several cases, including *Cho*, on the grounds that they do not involve stable value funds, are unpersuasive. *See* Opp'n 18-19, 26. For one, Plaintiffs themselves repeatedly rely on caselaw involving various investing products other than stable value funds. Putting that aside, the Court disagrees with the reasoning underlying Plaintiffs' argument. Namely, in the Court's view, stable value funds—like mutual funds and other investment products—involve tradeoffs between risks and rewards, even if to a different degree than active and passive funds. Thus, the Court finds all cases analyzing these tradeoffs, and whether a plaintiff is comparing products with similar risk-reward ratios, to be applicable here too. *See* Amicus Br. at 14 (explaining that the variation across stable value funds "means that the choice of a particular [stable value] product depends on context and investor-specific considerations, as each variation is an intentional trade off made for specific strategic reasons").

23

general account GICs had higher crediting rates during the Class Period.  *See* Compl. ¶¶ 82-85. But Plaintiffs do not provide the Court with sufficient facts to determine whether these funds are substantially similar.  Besides the crediting rates of the TIAA RCP and Lincoln Value SVF, the Court has little to no information to rely on for each of the comparator funds.  *See* Mot. at 8 & 19 (noting several features of these stable value funds that Plaintiffs did not include in the Complaint). When faced with a nearly identical failure to monitor challenge concerning a stable value fund, the *Grink* court held that:

> Plaintiffs fail[ed] to allege meaningful benchmarks to support their imprudence claims related to the [stable value fund].  Plaintiffs provide a chart comparing the crediting rates of the [stable value fund] to that of two allegedly "less risky" and "better performing" investments that they allege are, without factual support, "substantially identical" investments . . . .  But nothing about these alleged comparators support[s] an allegation that the [challenged fund] underperformed. *See Cho*, 2021 WL 4438186, at *8-9 (finding unsupported allegations that "peer funds" have a "similar investment style" do not "constitute a meaningful benchmark and [are] insufficient to plausibly allege . . . impruden[ce]"); *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 579 F. Supp. 3d 1133, 1147 (N.D. Cal. 2022) ("[L]abeling funds as 'comparable' or as a 'peer' is insufficient to establish that comparator funds are meaningful benchmarks against which to compare a challenged fund['s] performance.").  Put differently, the chart is merely a comparison of each investments' crediting rate and fails to substantively show how the investments performed overall.

2025 WL 3485686, at *12.  "Allegations of underperformance, without more, do not suffice." *Fumich*, 2025 WL 2399134, at *5 ("Merely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision—largely a process-based inquiry—that breaches a fiduciary duty." (quoting *Smith*, 37 F.4th at 1166)).  This is because the Court's focus is on the fiduciary's conduct in *arriving* at a decision, rather than whether, in hindsight, the fiduciary made the right call.  *See Sweda*, 923 F.3d at 329.  Plaintiffs' charts demonstrate that two stable value funds had higher crediting rates during the Class Period than the TIAA SVF.  But the

24

Complaint does not explain whether these funds are substantially similar to the TIAA SVF such that the stark difference in their crediting rates raises the inference that Defendant violated its duty of prudence at the time it made the decision to select and retain the TIAA SVF in the Plans.

Plaintiffs maintain that they offer support to raise the inference that Defendant breached its fiduciary duty of prudence, including that the Complaint contains facts about the holdings of TIAA comparator funds. Opp'n at 35-36. The only information in the Complaint describing the holdings of the TIAA RCP is provided in general terms, and those terms differ from the holdings of the TIAA SVF, provided in the next column in the chart. *See* Compl. ¶ 93. Despite those variances in holdings, Plaintiffs do not explain whether they are material, nor do they plead facts comparing the funds (aside from the liquidity of the TIAA RCP) in any respect. This is meaningfully less than the plaintiff in *Sweda*, who provided ample facts for the Court to rely on when considering whether the plaintiff stated a claim. 923 F.3d at 330-31.

In any event, the limited information Plaintiffs provide on the TIAA RCP does not excuse the dearth of information in the Complaint about the Lincoln SVF. Plaintiffs argue that the Forms 5500 that Defendant attaches to its Motion undermine any argument that the Lincoln SVF is riskier than the TIAA SVF. Opp'n at 33-34. Putting aside that Plaintiffs are relying on a document attached to Defendant's Motion to withstand a motion to dismiss challenging the sufficiency of the pleadings in the Complaint, their argument misses the point. Whether the TIAA SVF is riskier than the Lincoln SVF is not dispositive of whether Plaintiffs state a claim. Plaintiffs needed to plead more information about the Lincoln SVF, even considering its risk level, to allow the Court to draw the inference that Defendant breached its fiduciary duty of prudence. Similar to how the court in *Cho* did not hold that an actively managed fund could never be benchmarked to a passive fund, the Court today is not concluding that a separate account stable value fund can never be

25

compared to a general account stable value fund.[14]  The Court is merely holding that the Complaint, as alleged, does not establish that the comparator funds are sufficiently similar to the TIAA SVF such that a comparison of their crediting rates—supplemented by one or two facts for each comparator—gives rise to a claim.[15]

In sum, Plaintiffs have "failed to establish that the comparisons they provide are appropriate," *Kruchten*, 2024 WL 3518308, at *4, because they do not offer any meaningful explanation as to why the TIAA RCP and Lincoln SVF are "sufficiently similar to [the TIAA SVF to] render the comparisons valid," *Mator*, 102 F.4th at 188.  And the few other facts that Plaintiffs allege in the Complaint do not give rise to an inference that Defendant's decision to select and keep the TIAA SVF in the Plans was an imprudent one.  Accordingly, Plaintiffs have failed to state a claim as to its "failure to monitor" allegations, and the Court will therefore **DISMISS** those claims ***without prejudice***.[16]

---

[14] The Court also recognizes that other courts have come to the opposite conclusion.  *See, e.g.*, *Lacrosse v. Jack Henry & Assocs., Inc.*, No. 23-5088, 2024 WL 3564575, at *3 (W.D. Mo. July 11, 2024) (concluding that separate account and general account GICs provide the same benefit from the perspective of the investor and therefore they can be a meaningful benchmark).

The Court respectfully disagrees with that conclusion.  The Court is persuaded by the SVIA's argument that "if one thing unites [stable value] investments, it is their dependability as asset *preservation* products . . . That cardinal feature surely deserves significant weight when evaluating a fiduciary's choice of [stable value] product; market-beating returns are not the goal."  Amicus Br. at 18.

[15] For instance, Plaintiffs allege that the GIC market is "robust with many insurance companies offering GICs with competitive rates," Compl. ¶ 89, yet they offer no explanation other than the liquidity of the funds as to why these two funds specifically were chosen as comparators.

[16] "[I]n the event a complaint fails to state a claim, unless amendment would be futile, the District Court must give a plaintiff the opportunity to amend her complaint."  *Cnty. of Allegheny*, 515 F.3d at 228 (citing *Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000)).

Defendant's argument that the Court should dismiss Plaintiffs' claims with prejudice lacks merit and runs afoul of well-settled law.  Accordingly, its request is **DENIED**.

26

Plaintiffs may amend their Complaint to provide additional facts that allow the Court to draw the inference that Defendant violated its duty of prudence.  But as it stands, the Complaint provides insufficient circumstantial evidence for the Court to rely on, even when drawing all inferences in favor of Plaintiffs, to find that they have raised an inference that Defendant violated its duty of prudence by failing to remove the TIAA SVF.

**B.    RKA Excessive Fee Claims**

The parties also dispute whether Plaintiffs have stated a claim as to their RKA allegations.  Mot. at 25-28; Opp'n at 13-17; Reply at 10-12.  In a string of cases, including *Sweda*, *Mator*, and *Kruchten*, the Third Circuit addressed similar challenges.  As summarized in *Kruchten*—the most recent of the trio:

> [RKA] services fees can be considered excessive based on factual comparisons to other similar plans.  *Mator*, 102 F.4th at 185.  For example, the *Mator* plaintiffs compiled a table of [RKA] services fees paid by other plans that showed their plan paid fees several times more than what similar plans paid.  *Id.* at 180.  This factual context suggested that the plan administrator had failed to act prudently and accordingly *"nudge[d] the . . . claims across the line from possible to plausible."*  *Id.* at 186.

*Kruchten*, 2024 WL 3518308, at *3.  In *Krutchen*, the Third Circuit found the plaintiffs plausibly alleged that the challenged plan's fees were excessive when the plaintiffs:  (1) compiled a list of retirement plans and the RKA fees they charged, and explained why those other plans, which all had over 10,000 participants (like the challenged plan), were comparable; (2) included additional facts about the nature of the RKA services market, such as the fact larger plans have greater bargaining power to reduce fees; (3) alleged that the defendants did not conduct any efforts to solicit bids from competing recordkeeping providers; and (4) paired the allegations regarding the failure to conduct an RFP process with circumstantial evidence that the defendants had not reasonably scrutinized the challenged plan's fees.  *Id.*

27

Plaintiffs here follow the course charted by the *Mator* and *Krutchen* plaintiffs by also: (1) providing a chart in the Complaint comparing the RKA costs in the Plans to thirty-five plans similar in size to the Plans when combined (in terms of both AUM and number of participants), Compl. ¶ 142; (2) alleging that based on the fees paid by Plan participants that "there is little to suggest Defendant conducted an RFP," *id.* ¶ 134; and (3) pleading that the recordkeeping market is highly competitive and that Defendant, given the combined size of the Plans, could have negotiated for lower fees, *id.* ¶¶ 134, 136.  These allegations, when considered holistically, raise the inference that Defendant violated its fiduciary duty of prudence.  *See Krutchen*, 2024 WL 3518308, at *3; *Peterson v. Ins. Servs. Off., Inc.*, No. 20-13223, 2021 WL 1382168, at *4-5 (D.N.J. Apr. 13, 2021) (holding that the defendant's alleged failure to reduce recordkeeping costs through negotiation or the solicitation of competing bids may form the basis of a breach of fiduciary duty claim).

To its credit, Defendant acknowledges that the Complaint has many of the same allegations in *Mator* that the Third Circuit found sufficient to state a claim.  Mot. at 25.  Even so, Defendant claims that Plaintiffs fail to state a claim because Plaintiffs have improperly calculated the RKA fees.  Defendant primarily takes aim at Plaintiffs' allegation that each Plan pays a base fee of $45 per participant, arguing that allegation fails to recognize that the $45 fee is the total fee paid by all HMH plans (even beyond the three Plans involved in this Complaint), as opposed to the actual cost per Plan.  *Id.*  In other words, to determine the actual cost per Plan, Defendant asserts that the $45 base fee should be divided amongst all HMH plans that a participant is in.  For example, "if a participant were in two plans, the fee per plan would be $22.50 (45/2) and if a participant were in three plans, the fee would be $15 per plan (45/3)."  *Id.* at 11.  Defendant argues, when viewed through that lens, that the RKA fees were not excessive.  *Id.* at 12.

Building on this, Defendant points out that the Complaint does not plead facts as to "how many participants are in multiple HMH plans, or how many are just in one," and asserts that without that information, the Court cannot determine what is the real average cost per Plan participant. *Id.* at 27; *see* Reply at 11 ("Plaintiffs do not allege any facts that any of the comparator fee rates they identify cover recordkeeping services for participants in multiple plans, all for the same fee. And Plaintiffs do not even plead how many participants in the Plans are in multiple Plans, or other HMH-sponsored plans . . . ."). According to Defendant, it follows that Plaintiffs' RKA allegations fail because "if allegations are based on incorrect arithmetic, common sense says they are not well-pled." Mot. at 28 (quoting *Mator*, 102 F.4th at 190).

The Court disagrees with Defendant because "at the motion-to-dismiss stage, plaintiffs will necessarily be limited to calculations based on publicly available data." *Kruchten*, 2024 WL 3518308, at *3 (quoting *Mator*, 102 F.4th at 181). Defendant impermissibly demands that Plaintiffs plead facts that they cannot ascertain from publicly available information. While a Form 5500 lists the total number of participants at the beginning of the plan year, *see, e.g.*, D.E. 24-1, Ex. G at 3[17]—information that Plaintiffs include in the Complaint, *see* Compl. ¶ 15—that form does not contain information on how many individuals were in one or multiple Plans. Without access to that information, it is impossible for Plaintiffs to plead the facts that Defendant asks them to, and the Court will not dismiss Plaintiffs' claims on those grounds.[18] *See Peterson*, 2021 WL

---

[17] The Court uses the page numbers automatically generated by CM/ECF.

[18] Nevertheless, the Court recognizes that one of the four named Plaintiffs—Ms. Razon—participated in the 403(b) Plan and the 401(k) Plan. Compl. ¶ 30. For her, it appears the RKA fee paid per Plan was $22.50, which is below the $26 average fee as alleged in the Complaint's sample set. While the Court will not dismiss her from any excessive RKA claims at this juncture (given its view that would be premature), the Court notes that Defendant's argument might limit Plaintiffs' ability to pursue these claims later in the case for individuals like Ms. Razon.

1382168, at *5 (determining that a factual dispute over recordkeeping allegations at the motion to dismiss stage where the plaintiffs maintained they lacked access to accurate information did not halt the claim at that juncture).

Defendant also argues that the Court should not treat all plans offered by HMH (even those beyond the Plans) as one collective as Plaintiff when they identify similarly sized comparators does in the Complaint and the RKA fees they charged. Mot. at 27 n.8. According to Defendant, Plaintiffs' treatment of the Plans as one collective group has no support in the law. *Id.* But Defendant provides no support for its position either. Nor do Plaintiffs in Opposition when they call out Defendant for citing no law in its Motion. Opp'n at 17. Despite the lack of guidance, the Court concludes that without information on the number of participants in one or multiple plans, the Court cannot determine whether Plaintiffs' treatment of the Plans as one entity is reasonable at this time. Once discovery commences, Plaintiffs will obtain this information, and Defendant can challenge Plaintiffs' methodology at a later point in the case.

Given that the Third Circuit has instructed courts to take many of the same allegations Plaintiffs make here as true, *see Kruchten*, 2024 WL 3518308, at *3, and the Court has determined that Plaintiffs do not have access to the information needed to evaluate Defendant's calculation claims, the Court will **DENY** Defendant's Motion as it concerns Plaintiffs' RKA allegations.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT in part** and **DENY in part** Defendant's Motion. An appropriate order accompanies this Opinion.

Date:    March 13, 2026

_____
Evelyn Padin, U.S.D.J.

30