**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DEIDRA JACOBS, DENNIS LUBRIN, JACQUELINE JACK, and LUANNE RAZON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HACKENSACK MERIDIAN HEALTH, INC.,<br><br>Defendant. | **CIVIL ACTION NO.: 2:25-CV-01272-EP-CLW** |

# AMENDED COMPLAINT[1]

Plaintiffs Deidra Jacobs, Dennis Lubrin, Jacqueline Jack, and Luanne Razon ("Plaintiffs"), by and through their attorneys, on behalf of the Consolidated 403(b) Plan of Hackensack Meridian Health (the "403(b) Plan"), the HMH 401(k) Savings Plan (the "401(k) Plan"), and the Consolidated Defined Contribution Plan of

[1] Plaintiffs file this Amended Complaint pursuant to the Court Order dated March 25, 2026. *See* ECF No. 42 ("Plaintiffs may file an amended complaint on or before 4/17/2026.").

Hackensack Meridian Health ("Defined Contribution Plan") (together, the "Plans"),[2] themselves and all others similarly situated, state and allege as follows:

## I. INTRODUCTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plans' fiduciary, Hackensack Meridian Health, Inc. ("HMH" or the "Company"), for breaches of its fiduciary duties.

2. The Plans are defined contribution retirement plans, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plans. *See* Independent Auditor's Report ("Auditor's Report"), attached to 2024 Form 5500 for the 403(b) Plan at 6 ("The [403(b)] Plan, which was created and became effective January 1, 2011, is a defined contribution plan operating under Section 403(b) of the Internal Revenue Code."); Auditor's Report, attached to 2024 Form 5500 for the 401(k) Plan, at 6 ("The [401(k)] Plan, which was created and became effective January 1, 2019, is a defined contribution plan operating under Section 401(k) of the Internal Revenue Code ("IRC") and sponsored by Hackensack Meridian Health,

---

[2] The Plans are legal entities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants.

Inc."); Auditor's Report, attached to 2024 Form 5500 for the Defined Contribution Plan, at 6 ("The Plan, which was created and became effective January 1, 2011, is a defined contribution plan operating under Section 401(a) of the Internal Revenue Code.").

3. To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

4. The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "[e]stablish a prudent process for selecting investment options and service providers," including providers of the Plan's administrative and recordkeeping ("RKA") services, and "[m]onitor investment options and service providers once selected to see that they continue to be appropriate choices." *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2[3]; *see also Tibble v. Edison Int'l*, 135

[3] Available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited April 13, 2026).

S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5. With regard to plan fees, the DOL states "You should know that your employer also must consider the fees and expenses paid by your plan."[4]

6. Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

7. "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) ("*Tibble II*") (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b).[5]

8. The Supreme Court while interpreting "ERISA's duty of prudence in light of the common law of trusts," reiterated that a fiduciary "has a continuing duty

---

[4] *Id.*

[5] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource- center/publications/a-look-at-401k-plan-fees.pdf (last visited April 13, 2026) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

of some kind to monitor investments and remove imprudent ones" and that a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

9. Plaintiffs allege that during the putative Class Period, Defendant, as s "fiduciary" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties it owed to the Plans, to Plaintiffs, and to the other participants of the Plans by, *inter alia*, failing to objectively and adequately review the Plans' investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance, and failing to control the Plan's RKA costs.

10. At all times during the Class Period, the 403(b) Plan, the 401(k) Plan, and the Defined Contribution Plan combined had over two billion dollars in assets under management. At the start of the Class Period in 2019, the 403(b) Plan had almost $1.7 billion dollars, the 401(k) Plan had $257 million and the Defined Contribution Plan had $290 million in assets under management. *See* 2019 Form 5500s for the Plans, Schedule H, at 2. Collectively, the Plans had over $2.2 billion in assets under management in 2019.

11. By 2024, the 403(b) Plan had $1,804,837,689, the 401(k) Plan had $2,131,270,226, and the Defined Contribution Plan had $275,709,669 in assets

under management. *See* 2024 Form 5500s for the Plans, Schedule H, at 2. Collectively, the Plans had over $4.2 billion in assets under management in 2024.

12. The Plans' assets under management qualifies them collectively as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. In 2023, only 0.1 percent (1,005 of 721,950) of plans in the country had more than $1 billion in assets under management.[6] In addition, this was true at the start of the Class Period in 2019 where only 0.1 percent (776 of 603,217) of 401(k) plans in the country were as large as the Plans.[7]

13. The Plans are also large in terms of the number of their participants. At the beginning of the Class Period, the 403(b) Plan had 8,736 participants, the 401(k) Plan had 29,798 participants, and the Defined Contribution Plan had 7,543 participants. *See* 2019 Form 5500s for the Plans, at 2. By 2024, the 403(b) Plan had 22,465 participants, the 401(k) Plan had 53,979 participants, and the Defined Contribution Plan had 10,545 participants. *See* 2024 Form 5500s for the Plans, at 2. For comparison, according to information derived from ERISApedia.com's

---

[6] *See* The ICI/ISS Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2023 at Ex. 1.2, p. 6., available at https://www.ici.org/system/files/2026-03/26-rpt-dcplan-profile23-401k.pdf

[7] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

database, a service that compiles all Form 5500s filed with the Dept. of Labor ("DOL") by retirement plans, in 2020, there were only 194 defined contribution plans (401k, 401a, and 403b) in the country with between 20,000 and 29,999 participants with account balances. Additionally, there were only 54 retirement plans with between 40,000 and 49,999 participants.

14. With regard to the Plans' investments, Defendant breached its fiduciary duty of prudence by selecting and/or maintaining a certain stable-value investment with lower crediting rates when compared to available similar or identical investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

15. Specifically, Defendant allowed substantial assets in the Plans to be invested in the TIAA Stable Value Fund ("TIAA GIC"), a guaranteed investment contract, that provided a significantly lower rate of return than comparable stable value funds that Defendant could have made available to the Plans' participants.

16. A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.* preservation of investment assets.

17. TIAA benefited significantly from participants in the Plans investing in the TIAA GIC. A prudent fiduciary who adequately monitored the Plans' investments and placed the interests of participants in the Plans above all would have

recognized that the TIAA GIC was benefitting TIAA at the expense of the participants in the Plans. The investments in the TIAA GIC were held and invested by TIAA, which kept the spread (the difference between the amount it earned on the investment and the amount it paid to the Plans' participants). The crediting rates that TIAA provided to the Plans were and are so low that TIAA reaped a windfall on the spread.

18. Plaintiffs also allege that the Defendant engaged in prohibited transactions with a party-in-interest. Specifically, Defendant breached its fiduciary duties of prudence by allowing a party-in-interest, TIAA,[8] to benefit from its provision of services to the Plans by receiving excessive compensation for managing the TIAA GIC.

19. The arrangements and transactions with TIAA are prohibited transactions because they "amount[] to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

20. Defendant's mismanagement of the Plans, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence,

---

[8] "Certain Plan investments are managed by the custodians, and therefore, these transactions qualify as party-in-interest transactions." Auditor's Report, attached to 2024 Form 5500 for the 403(b) Plan, at 12.

in violation of 29 U.S.C. § 1104. Its actions were contrary to actions of a reasonable fiduciary and cost the Plans and its participants millions of dollars.

21. Based on this conduct, Plaintiffs assert claims against Defendant for breach of the fiduciary duty of prudence (Count I), and violations of ERISA's prohibited transactions (Count II).

## II. JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

23. This Court has personal jurisdiction over Defendant because it is headquartered and transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

24. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendant resides and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III. PARTIES

**Plaintiffs**

25. Plaintiff, Deidra Jacobs ("Jacobs"), resides in Flemington, NJ. During her employment, Plaintiff Jacobs participated in the 401(k) Plan. Ms. Jacobs invested in the TIAA GIC in the 401(k) Plan and suffered injury to her Plan account due to the significant underperformance of the TIAA GIC. In addition, Plaintiff Jacobs also suffered injury to her Plan account by paying excessive recordkeeping costs.

26. Plaintiff, Dennis Lubrin ("Lubrin"), resides in Metuchen, NJ. During his employment, Plaintiff Lubrin participated in the 401(k) Plan and suffered injury to his Plan account due to the significant underperformance of the TIAA GIC. In addition, Plaintiff Lubrin suffered injury to his Plan account by paying excessive recordkeeping costs.

27. Plaintiff, Jacqueline Jack ("Jack"), resides in Andalusia, PA. During her employment, Plaintiff Jack participated in the Defined Contribution Plan. Ms. Jack suffered injury to her Plan account by paying excessive recordkeeping costs.

28. Plaintiff, Luanne Razon ("Razon"), resides in Union, NJ. During her employment, Plaintiff Razon participated in the 403(b) Plan and the 401(k) Plan. Ms. Razon invested in the TIAA GIC in the 401(k) Plan and suffered injury to her Plan account due to the significant underperformance of the TIAA GIC. In addition,

Plaintiff Razon suffered injury to her Plan account by paying excessive recordkeeping costs.

29. Plaintiffs have standing to bring this action on behalf of the Plans because they participated in the Plans and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendant's breaches of fiduciary duties as described herein.

30. Further, each of the Plaintiffs have standing to bring this action on behalf of the Plans even if they only participated in one of the Plans because "[an individual in one ERISA benefit plan can represent a class of participants in numerous plans other than his own, if the gravamen of the plaintiff's challenge is to the general practices which affect all of the plans." *Fallick v. Nationwide Mutual Ins. Co.,* 162 F.3d 410, 422 (6th Cir. 1998); *see also Dann v. Lincoln Natl. Corp.*, *et al.*, 708 F.Supp.2d 481, 487 (E.D. Pa. 2010); *Mulder v. PCS Health Sys., Inc.*, 216 F.R.D. 307, 317 (D.N.J. 2003) ("Mulder has standing to pursue his claims on behalf of members of other employee benefit plans included in the definition of the class.")

31. Here the Plans were sponsored by Defendant and administered in the same manner, including having TIAA serve as the recordkeeper for all the Plans and having the TIAA GIC as an investment option.

32. Plaintiffs did not have knowledge of all material facts necessary to understand that Defendant breached its fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendant**

33. Hackensack Meridian Health is the sponsor of the Plans and a named fiduciary of the Plans with a principal place of business at 343 Thornall Street, Edison, New Jersey. *See* The December 31, 2023 Form 5500 of the 403(b) Plan ("2023 403(b) Form 5500"), at 1, The December 31, 2023 Form 5500 of the 401(k) Plan ("2023 401(k) Form 5500"), at 1, and The December 31, 2023 Form 5500 of the Defined Contribution Plan ("2023 Defined Contribution Plan Form 5500"), all filed with the United States Department of Labor. HMH is the largest health care network in New Jersey, with 18 hospitals, 40,000 team members, and 500+ patient care locations.[9]

34. The Company is a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) for several reasons. First, it is the 403(b) Plan, 401(k) Plan and Defined Contribution Plan administrator. *See* TIAA ERISA 403(b) Volume Submitter Plan ("403(b) Plan Doc."), at 66 ("The Named Fiduciaries

[9] *See* https://www.hackensackmeridianhealth.org/en/about-us last accessed on April 13, 2026.

of the Plan are the Employer and Plan Administrator.");[10] *see also* 2024 Form 5500 for the 401(k) Plan, at 2; 2024 Form 5500 for the Defined Contribution Plan, at 2. Second, it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.[11]

35. For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

## IV. CLASS ACTION ALLEGATIONS[12]

36. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):

> All persons, except Defendant and any fiduciary of the Plans and their immediate family members, who were participants in or beneficiaries of the 403(b) Plan, the 401(k) Plan, and/or the Defined Contribution Plan at any

---

[10] Pursuant to the Adoption Agreement #002 Simplified ERISA 403(b) Volume Submitter Plan ("403(b) Adoption Agreement"), the Plan Administrator is the Employer. *See* 403(b) Adoption Agreement, at 1.

[11] *See* 403(b) Plan Doc., at 66, Section 7.02(C) "General Powers and Duties."

[12] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plans because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plans and all participants. *See, e.g., In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

time between February 14, 2019 to the date of judgment
(the "Class Period").[13]

37. The members of the Class are so numerous that joinder of all members is impractical. The 2024 Form 5500 for the 403(b) Plan lists 22,465 Plan "participants with account balances as of the end of the plan year." 2024 Form 5500 for the 403(b) Plan, at 2. The 2024 Form 5500 for the 401(k) Plan lists 53,979 Plan "participants with account balances as of the end of the plan year." 2024 Form 5500 for the 401(k) Plan, at 2. The 2024 Form 5500 for the Defined Contribution Plan lists 10,545 Plan "participants with account balances as of the end of the plan year." 2024 Form 5500 for the Defined Contribution Plan, at 2.

38. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plans and have suffered injuries as a result of Defendant's mismanagement of the Plans. Defendant treated Plaintiffs consistently with other Class members, and managed the Plans as single entities. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendant as alleged herein, and all members of the Class have been similarly affected by Defendant's wrongful conduct.

[13] Plaintiffs reserve their right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action, and to seek modification of the class definition, including the ending date of the Class Period in the event that further investigation/discovery reveals a more appropriate end period.

39. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A. Whether Defendant is a fiduciary of the Plans;

B. Whether Defendant breached its fiduciary duty of prudence by engaging in the conduct described herein;

C. The proper form of equitable and injunctive relief; and

D. The proper measure of monetary relief.

40. Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

41. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests

of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

42. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V. THE PLANS

### 1. The 403(b) Plan

43. The purpose of the 403(b) Plan is to provide Hackensack employees "with the opportunity to save for retirement on a tax advantaged basis." *See* Consolidated 403(b) Plan of Hackensack Meridian Health Summary Plan, at 1.

44. The 403(b) Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

45. The 403(b) Plan was created and became effective on January 1, 2011. *See* Auditor's Report attached to 2024 Form 5500 for the 403(b) Plan, at 6.

***Eligibility***

46. To participate in the 403(b) Plan, a participant becomes eligible to participate in the 403(b) Plan after the first day of employment. *See* 403(b) Adoption Agreement, at 6.

***Contributions***

47. As of December 31, 2018, no contributions were made to the 403(b) Plan. *See* Consolidated 403(b) Plan of Hackensack Meridian Health Summary Plan Description ("403(b) SPD"), at 1 ("regardless of anything in this Summary to the contrary, no contributions will be made to the [403(b)] Plan as of December 31, 2018.").

48. Prior to December 31, 2018, participants in the 403(b) Plan could elect to reduce their compensation by a specific percentage and have that amount contributed to the 403(b) Plan on a pre-tax basis as an elective deferral, which includes both pre-tax deferrals and Roth deferrals. *See* 403(b) SPD, at 2.

49. Participants may also elect to make rollover contributions, which include distributions participants received from other plans and certain IRAs. *See id*.

***Vesting***

50. Participants "are always 100% vested in all of [their] Plan accounts." SPD, at 4.

***Investments***

51. Included in the 403(b) Plan's available funds was a guaranteed investment contract offered by TIAA. *See* Auditor's Report, attached to 2024 Form 5500 for the 403(b) Plan, at 10 ("The Plan holds the TIAA Stable Value Fund, a traditional investment contract.").

52. At the end of 2019, $27,150,246 in 403(b) Plan assets were invested in the TIAA GIC. *See* Schedule H, Line 4i - Schedule of Assets (Held at End of Year), attached to 2019 Form 5500 for the 403(b) Plan, at S.1.

53. At the end of 2024, over $154 million in 403(b) Plan assets were invested in the TIAA GIC. *See* Schedule H, Line 4i - Schedule of Assets (Held at End of Year), attached to 2024 Form 5500 for the 403(b) Plan, at S.1.

54. The chart below demonstrates the amount of 403(b) Plan assets invested in the TIAA GIC during the Class Period.

| Plan Year | 403(b) Plan Assets in TIAA GIC | Total Amount of Plan Assets | Plan Assets in TIAA GIC as Percentage of Total Plan Assets |
|---|---|---|---|
| 2019 | $27,150,246 | $1,693,771,770 | 1.60% |
| 2020 | $182,148,370 | $1,803,107,727 | 10.10% |
| 2021 | $172,436,957 | $1,921,293,403 | 8.98% |
| 2022 | $177,275,737 | $1,561,034,783 | 11.36% |
| 2023 | $165,373,764 | $1,716,797,093 | 9.63% |
| 2024 | $154,342,359 | $1,804,837,689 | 8.55% |

**2. The 401(k) Plan**

55. The 401(k) Plan was created and became effective January 1, 2019. *See* Auditor's Report, attached to 2024 Form 5500 for the 401(k) Plan, at 6.

56. The 401(k) Plan is a defined contribution plan within the meaning of ERISA. *See id*.

***Eligibility***

57. "Eligible employees are able to participate in the Plan as soon as administratively possible following their hire date." *Id*.

***Contributions***

58. "Each year, participants may contribute a minimum of 1% up to a maximum of 70% of their pretax compensation, as defined in the [401(k)] Plan document. Participants may also designate contributions as Roth contributions. The [401(k)] Plan provides for an automatic enrollment provision of 3% of compensation." *Id*., at 7.

59. The 401(k) Plan provides for a tiered employer matching contribution. The first tier matching percentage is 100% of elective deferrals equal to 2% of the participant's contribution. The second tier matching percentage is 50% of elective deferrals equal to 3% of the participant's contribution. *See id*.

60. "All eligible employees will receive a 1.5% nonelective contribution that is calculated and contributed annually." *Id*.

***Vesting***

61. "Participants are fully and immediately vested in their own contributions, rollover contributions and actual earnings thereon. Participants become fully vested in the Network's matching and nonelective contributions after three years of service." *Id.*

***Investments***

62. Included in the 401(k) Plan's available funds was a guaranteed investment contract offered by TIAA. *See* Auditor's Report, attached to 2024 Form 5500 for the 401(k) Plan, at 10 ("The Plan holds the TIAA Stable Value Fund, a traditional investment contract.").

63. At the end of 2019, $11,767,484 in 401(k) Plan assets were invested in the TIAA GIC. *See* Schedule H, Line 4i - Schedule of Assets (Held at End of Year), attached to 2019 Form 5500 for the 401(k) Plan, at S.1.

64. At the end of 2024, over $102 million in 401(k) Plan assets were invested in the TIAA GIC. *See* Schedule H, Line 4i - Schedule of Assets (Held at End of Year), attached to 2024 Form 5500 for the 401(k) Plan, at S.1.

65. The chart below demonstrates the amount of 401(k) Plan assets invested in the TIAA GIC during the Class Period.

| Plan Year | 401(k) Plan Assets in TIAA GIC | Total Amount of Plan Assets | Plan Assets in TIAA GIC as Percentage of Total Plan Assets |
|---|---|---|---|
| 2019 | $11,767,484 | $257,505,458 | 4.57% |
| 2020 | $31,029,789 | $580,594,125 | 5.34% |
| 2021 | $44,273,999 | $912,379,889 | 4.85% |
| 2022 | $65,963,311 | $1,021,657,133 | 6.46% |
| 2023 | $83,685,415 | $1,603,448,159 | 5.22% |
| 2024 | $102,039,150 | $2,131,270,226 | 4.79% |

**3. Defined Contribution Plan**

66. The Defined Contribution Plan was created and became effective January 1, 2011. *See* Auditor's Report, attached to 2024 Form 5500 for the Defined Contribution Plan, at 6.

67. The Defined Contribution Plan is a defined contribution plan within the meaning of ERISA. *See id*.

***Eligibility***

68. "The [Defined Contribution] Plan is a frozen plan and no new employees may become participants." *Id*.

***Vesting***

69. "Participants are immediately and fully vested in their own contributions and in their rollover contributions, if any, plus actual earnings thereon. Participants vest in employer sourced contributions based on the vesting schedules of their respective legacy plan." *Id*.

***Investments***

70. Included in the Defined Contribution Plan's available funds was a guaranteed investment contract offered by TIAA. *See* Auditor's Report, attached to 2024 Form 5500 for the Defined Contribution Plan, at 10 ("The Plan holds the TIAA Stable Value Fund, a traditional investment contract.").

71. At the end of 2019, $1,283,221 in Defined Contribution Plan assets were invested in the TIAA GIC. *See* Schedule H, Line 4i - Schedule of Assets (Held at End of Year), attached to 2019 Form 5500 for the Defined Contribution Plan, at S.1.

72. At the end of 2024, over $23 million in Defined Contribution Plan assets were invested in the TIAA GIC. *See* Schedule H, Line 4i - Schedule of Assets (Held at End of Year), attached to 2024 Form 5500 for the Defined Contribution Plan, at S.1.

73. The chart below demonstrates the amount of Defined Contribution Plan assets invested in the TIAA GIC during the Class Period.

| Plan Year | Defined Contribution Plan Assets in TIAA GIC | Total Amount of Plan Assets | Plan Assets in TIAA GIC as Percentage of Total Plan Assets |
|---|---|---|---|
| 2019 | $1,283,221 | $258,417,423 | 0.50% |
| 2020 | $26,275,180 | $272,827,894 | 9.63% |
| 2021 | $25,227,871 | $294,348,956 | 8.57% |
| 2022 | $24,640,428 | $252,058,789 | 9.78% |
| 2023 | $23,839,485 | $275,709,669 | 8.65% |
| 2024 | $23,074,793 | $290,304,776 | 7.95% |

## VI. THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANT FAILED TO SELECT AND MONITOR THE TIAA GIC IN A PRUDENT MANNER

### A. The TIAA GIC in the Plans

74. As indicated above, the Plans were invested in the TIAA GIC, a proprietary stable value fund managed by TIAA.[14]

75. A stable value fund is a conservative, fixed income investment vehicle that provides a relatively stable rate of return.[15]

76. Stable value funds can be managed via guaranteed insurance contracts ("GICs"), "in which the fund manager holds or invests in a single group annuity contract issued directly to the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer."[16]

77. The TIAA GIC is thus a contract and not a mutual fund investment. To be sure, there are important differences between a mutual fund and stable value fund. Unlike mutual funds, stable value funds are defined by their predictability, they offer a set return on investment irrespective of management style, and their associated risk level is a creature of their structural design rather than their investment strategy.

---

[14] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

[15] *Id.*

[16] *Id.*

78. There are generally three types of GICs: a traditional GIC (sometimes called an insurance company general account), like the TIAA GIC; a separate account GIC; and a synthetic GIC (sometimes called a security backed investment contract).

79. Here, the TIAA GIC "meets the fully benefit-responsive investment contract criteria and therefore is reported at contract value. Contract value is the relevant measure for fully benefit-responsive investment contracts because this is the amount received by participants if they were to initiate permitted transactions under the terms of the Plan. Contract value represents contributions made under each contract, plus earnings less participant withdrawals, and administrative expenses." *See, e.g.*, Auditor's Report, attached to 2024 Form 5500 for the 403(b) Plan, at 10.

80. The Auditor's Reports attached to the 2024 Form 5500s for the Plans state as follows:

> The Plan holds the TIAA Stable Value Fund, ***a traditional investment contract***. ***This fund meets the fully benefit-responsive investment contract criteria and therefore is reported at contract value.*** Contract value is the relevant measure for fully benefit-responsive investment contracts because this is the amount received by participants if they were to initiate permitted transactions under the terms of the Plan. ***Contract value represents contributions made under each contract, plus earnings less participant withdrawals, and administrative expenses***.
>
> ***The fund is a guaranteed investment contract***. ***The contract issuer is contractually obligated to repay the principal and interest at a specified rate that is guaranteed to the Plan***. The

> crediting rate is based on a formula established by the contract issuer but may not be less than 1%. ***The crediting rate is reviewed on a semi-annual basis for resetting***. ***The contract cannot be terminated before the scheduled maturity date***.
>
> ***The Plan's ability to receive amounts due in accordance with fully benefit-responsive investment contracts is dependent on the third-party issuer's ability to meet its financial obligations***. The issuer's ability to meet its contractual obligations may be affected by future economic and regulatory developments. As of December 31, 2024 and 2023, the high credit ratings of Teachers Insurance and Annuity Association and College Retirement Equities Fund uphold its ability to meet obligations set forth in contracts.
>
> Certain events might limit the ability of the Plan to transact at contract value with the contract issuer. ***No events have occurred or are probable of occurring that might limit the ability of the Plan to transact at contract value with the contract issuers and that also would limit the ability of the Plan to transact at contract value with the participants***.

Auditors' Reports attached to the 2024 Form 5500 for the Plans, at 10 (emphasis added).

81. Benefit responsive means that the participants can initiate transactions, such as withdrawals, at book value without adjustment.

82. For the above reasons, the TIAA GIC's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) whose contracts are with creditworthy insurance carriers, and (3) whose insurance company cannot terminate the agreement prior to the scheduled maturity date. The TIAA GIC's crediting rates can be also compared

to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the TIAA GIC, therein making stated risk considerations equivalent.

83. As discussed below, Defendant's selection of the imprudent TIAA GIC was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### B. Defendant Failed ERISA's High Standards Regarding Process and Methodology for Evaluating Investments

84. As described in the "Parties" section above, Defendant was a fiduciary of the Plans.

85. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

86. As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are

'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

87. Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

88. Reasonable prudent monitoring of stable value funds like GICs requires fiduciaries to evaluate the terms and conditions of the GIC contracts, research the relevant market, and test the market by, among other things, issuing requests for information and proposals from competing GIC providers.

89. In the case of stable value options, there is not one commonly accepted and publicly available index in which to compare GICs.

90. Accordingly, the measurement of stable value funds, and specifically the TIAA GIC, against prudently managed alternative stable value funds is critical given that these alternatives represent other investments available to a plan, which

may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

91. Indeed, "peer comparison is one of the most widely used and accepted methods of equity analysis used by professional analysts, individual investors, and professionals."[17]

92. Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

93. It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

94. It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

95. To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the

[17] *See* https://www.investopedia.com/terms/p/peer-group.asp (last visited April 10, 2026).

provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

96. Plaintiffs did not have and do not have actual knowledge of the specifics of Defendant's decision-making process with respect to the Plan, including Defendant's processes (and execution of such) for selecting, monitoring, and removing the Plans' investments and fees because this information is solely within the possession of Defendant prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

97. In fact, in an attempt to discover the details of the 403(b) Plan's mismanagement, Plaintiffs wrote to the 403(b) Plan administrator on March 14, 2024 to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]" "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA.

98. By letter dated April 12, 2024, the 403(b) Plan's administrator responded to Plaintiffs' request. No investment policy statement, to the extent it exists, or meeting minutes, to the extent they exist, were produced in response to Plaintiffs' request. Nor was the investment management contract for the TIAA GIC provided.

99. Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

100. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

101. In particular, Defendant failed to prudently monitor the TIAA GIC, by among other things, determining readily available alternative stable value funds to replace the imprudent TIAA GIC.

102. Defendant's breaches of its fiduciary duties, relating to its overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the TIAA GIC in the Plans throughout the Class Period that wasted the assets of the Plans and the assets of participants because of unnecessary costs and underperformance.

**C. The TIAA GIC Materially Underperformed Relative to Comparator Stable Value Fund GICs**

103. As noted above, selecting and monitoring stable value products requires researching the relevant market, and testing the market by, among other things, issuing requests for proposals to solicit bid proposals. That is because stable value products are substantially similar in that their stated goal is to preserve income.

104. Accordingly, it is a best practice for plans with substantial participant investments in stable value products to solicit competitive bids to initially select a stable value product, monitor opportunities in the marketplace on an ongoing basis, and periodically solicit competitive bids.

105. The Plans' fiduciary took no such steps. Had Defendant continually monitored and evaluated the TIAA GIC's rates, it would have known, if it did not actually know, that the investment underperformed year after year for the entire Class Period compared to other comparable stable value funds.

106. If Defendant had adopted and implemented a prudent process or policy, it could easily have selected or switched to another stable value fund with a proven track record of competitive returns.

107. The terms of the TIAA GIC allow for this action. The TIAA GIC provides a guaranteed interest rate that is guaranteed for a six-month period before it is reviewed for resetting.[18] So at a minimum, every six months leading up to and during the Class Period, Defendant had an opportunity to rectify its imprudent conduct and select another GIC with higher crediting rates.

108. As stated above, the TIAA GIC's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) whose contracts are with creditworthy insurance carriers, and (3) whose insurance company cannot terminate the agreement prior to the scheduled maturity date. Additionally, TIAA GIC's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the TIAA GIC, therein making risk considerations equivalent.

---

[18] *See, e.g.*, Auditor's Reports, attached to 2024 Form 5500 for the 403(b) Plan, at 10 ("The crediting rate is reviewed on a semi-annual basis for resetting.").

109. The Comparator GICs below meet these requirements. Importantly, the TIAA GIC had chronically underperforming crediting rates when compared against stable value GICs provided by other comparable carriers for other retirement plans.

110. Defendant's selection of the imprudent TIAA GIC was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

**1. There are Many GICs in the Marketplace with Competitive Crediting Rates**

111. The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

112. Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plans, but were not selected by Defendant.

113. The Comparator GICs (defined below) were offered in other defined contribution plans, like the Plans, and bore no characteristics that would make them ineligible for inclusion in the Plans. Thus, the Comparator GICs were clearly available to be selected by the Plans' fiduciary.

114. As representative examples, these comparisons include:

- Auto-Owners Life Insurance Company ("AOLIC") provided a "fully benefit-responsive investment contract" for the Auto-Owners Insurance Company Retirement Savings Plan. Auditor's Report, attached to 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at 9. Further, like the TIAA GIC, "[t]he plan

administrator does not believe that the occurrence of and such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id.*, at 10. Finally, "[t]he guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id.*

- The Ameritas 401(k) Retirement Plan offered a "fully benefit-responsive" unallocated insurance contract with Ameritas Life Insurance Corp. Auditor's Report attached to the 2024 Form 5500 for the Ameritas 401(k) Retirement Plan, at 10. "Interest rate guarantees of the unallocated insurance contract are backed by assets held by the Company." *Id.* Like the TIAA GIC, "[u]nder no event may the Company terminate this contract and settle at an amount different from contract value." *Id.*

- The Standard 401(k) Plan offered "a fully benefit-responsive investment contract ("FBRIC") with Standard [Insurance Company]." Auditor's Report attached to 2024 Form 5500 for The Standard 401(k) Plan. "The Plan's ability to receive amounts due is dependent on the issuer's ability to meet its financial obligations." *Id.* Like the TIAA GIC, "[t]he FBRIC does not permit the insurance company to terminate the agreements prior to the scheduled maturity date" and "[n]o events are probable of occurring that might limit the Plan's ability to transact at contract value with the contract issuer and that also would limit the ability of the Plan to transact at contract value with the participants. *Id.*

- The Ford Foundation Retirement Plan offered "a guaranteed fixed annuity contract" that was "fully and unconditionally guaranteed by TIAA." Auditor's Report, attached to 2024 Form 5500 for the Ford Foundation Retirement Plan, at 11. "The participant's principal, plus a specified minimum rate of interest, are guaranteed by TIAA's claims-paying ability." *Id.*, at 12.

- The Transamerica 401(k) Retirement Savings Plan offered "a fully benefit-responsive GIC with TFLIC, where TFLIC maintains the contributions in a general account." Auditor's Report, attached to 2024 Form 5500 for the Transamerica 401(k) Retirement Savings Plan, at 8. "The GIC issuer contractually must repay the principal and a specified interest rate that the issuer guarantees to the Plan." *Id.* Like the TIAA GIC, "[t]he Company does not believe that the occurrence of any such

> events that would limit the Plan's ability to transact at contract value with participants is probable." *Id.*, at 9.

115. Collectively, the GICs in the Auto-Owners Insurance Company Retirement Savings Plan, the Ameritas 401(k) Retirement Plan, The Standard 401(k) Plan, the Ford Foundation Retirement Plan, and the Transamerica 401(k) Retirement Savings Plan are referred to as the "Comparator GICs."

116. The TIAA GIC in the Plans is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar or lower riskiness provided by other comparable carriers for other retirement plans.

117. The TIAA GIC's consistent underperformance was detrimental to Plan participants. Because of the compounding losses or gains of investments, prudent fiduciaries will compare relative performance of comparable investments, rather than just absolute performance. This is because even a "1%" difference causes exponential losses beyond what occurs "each year" because of the "lost investment opportunity" that a better performing fund "would have earned over time." *Tibble II*, 843 F.3d at 1198.

**a. The TIAA GIC performed poorly when compared to the Comparator GICs at the Start of the Class Period**

118. In 2019, the Comparator GICs performed much better than the TIAA GIC. Specifically, the Comparator GICs had a calculated average crediting rate of

3.67%. In 2019, the crediting rate was 2.25% for the TIAA GIC in the 403(b) Plan, 1.15% in the 401(k) Plan, and 1.95% in the Defined Contribution Plan.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[19] |
|---|---|---|---|---|---|
| 2019 | Auto-Owners Insurance Company Retirement Savings Plan | 7,192 | $620,678,961 | Auto-Owners Insurance Company | 3.11% |
| | Ameritas 401(k) Retirement Plan | 3,553 | $708,127,755 | Ameritas Life Insurance | 3.64% |
| | The Standard 401(k) Plan | 4,554 | $920,504,787 | Standard Insurance | 3.69% |
| | Ford Foundation Retirement Plan | 228 | $292,861,235 | TIAA-CREF | 4.08% |
| | Transamerica 401(k) Retirement Savings Plan | 14,722 | $2,347,162,318 | Transamerica Financial Life | 3.85% |
| | **403(b) Plan** | **8,736** | **$1,693,771,770** | **TIAA GIC** | **2.25%** |
| | **401(k) Plan** | **29,798** | **$257,505,458** | **TIAA GIC** | **1.15%** |
| | **Defined Contribution Plan** | **7,543** | **$258,417,423** | **TIAA GIC** | **1.95%** |

[19] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

119. In 2019, the TIAA GIC underperformed the Comparator GICs by 38.76% in the 403(b) Plan, 68.70% in the 401(k) Plan, and 46.92% in the Defined Contribution Plan.

120. Additionally, the TIAA GIC underperformed other GICs with similar characteristics as the TIAA GIC in 2019, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2019 | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln Financial Group | 4.29% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |
| | Holzer Health System 401(a) Profit Sharing Plan | 1,896 | $179,609,420 | American United Life Insurance Company | 3.98% |
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | **403(b) Plan** | **8,736** | **$1,693,771,770** | **TIAA GIC** | **2.25%** |
| | **401(k) Plan** | **29,798** | **$257,505,458** | **TIAA GIC** | **1.15%** |
| | **Defined Contribution Plan** | **7,543** | **$258,417,423** | **TIAA GIC** | **1.95%** |

**b. The TIAA GIC's Poor Performance Continued through 2020**

121. As demonstrated in the table below, the TIAA GIC's poor performance continued through 2020.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2020 | Auto-Owners Insurance Company Retirement Savings Plan | 7,192 | $620,678,961 | Auto-Owners Insurance Company | 3.07% |
| | Ameritas 401(k) Retirement Plan | 3,553 | $708,127,755 | Ameritas Life Insurance | 3.48% |
| | The Standard 401(k) Plan | 4,554 | $920,504,787 | Standard Insurance | 3.23% |
| | Ford Foundation Retirement Plan | 228 | $292,861,235 | TIAA-CREF | 4.04% |
| | Transamerica 401(k) Retirement Savings Plan | 14,722 | $2,347,162,318 | Transamerica Financial Life | 3.27% |
| | **403(b) Plan** | **27,132** | **$1,803,107,727** | **TIAA GIC** | **2.06%** |
| | **401(k) Plan** | **34,068** | **$580,594,125** | **TIAA GIC** | **1.50%** |
| | **Defined Contribution Plan** | **11,287** | **$272,827,894** | **TIAA GIC** | **2.13%** |

122. In 2020, the TIAA GIC underperformed the Comparator GICs by 39.73% in the 403(b) Plan, 56.11% in the 401(k) Plan and 37.68% in the Defined Contribution Plan.

123. Additionally, the TIAA GIC underperformed other GICs with similar characteristics as the TIAA GIC in 2020, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | Alina 401(k) Retirement Savings Plan | 32,203 | $2,690,046,457 | Brighthouse Life Insurance Company | 3.72% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **403(b) Plan** | **27,132** | **$1,803,107,727** | **TIAA GIC** | **2.06%** |
| | **401(k) Plan** | **34,068** | **$580,594,125** | **TIAA GIC** | **1.50%** |
| | **Defined Contribution Plan** | **11,287** | **$272,827,894** | **TIAA GIC** | **2.13%** |

**c. The TIAA GIC's Poor Performance Continued through 2021**

124. As demonstrated in the table below, the TIAA GIC's poor performance continued through 2021.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Auto-Owners Insurance Company Retirement Savings Plan | 7,480 | $711,146,156 | Auto-Owners Insurance Company | 3.02% |
| | Ameritas 401(k) Retirement Plan | 3,537 | $779,870,323 | Ameritas Life Insurance | 3.43% |
| | The Standard 401(k) Plan | 4,674 | $1,062,535,266 | Standard Insurance | 3.29% |
| | Ford Foundation Retirement Plan | 198 | $309,155,677 | TIAA-CREF | 3.56% |
| | Transamerica 401(k) Retirement Savings Plan | 14,065 | $2,563,127,214 | Transamerica Financial Life | 3.32% |
| | **403(b) Plan** | **25,503** | **$1,921,293,403** | **TIAA GIC** | **2.48%** |
| | **401(k) Plan** | **36,662** | **$912,379,889** | **TIAA GIC** | **1.94%** |
| | **Defined Contribution Plan** | **10,578** | **$294,348,956** | **TIAA GIC** | **2.29%** |

125. In 2021, the TIAA GIC underperformed the Comparator GICs by 25.39% in the 403(b) Plan, 41.64% in the 401(k) Plan, and 31.11% in the Defined Contribution Plan.

126. Additionally, the TIAA GIC underperformed other GICs with similar characteristics as the TIAA GIC in 2021, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **403(b) Plan** | **25,503** | **$1,921,293,403** | **TIAA GIC** | **2.48%** |
| | **401(k) Plan** | **36,662** | **$912,379,889** | **TIAA GIC** | **1.94%** |
| | **Defined Contribution Plan** | **10,578** | **$294,348,956** | **TIAA GIC** | **2.29%** |

### d. The Comparator GICs Outperformed the TIAA GIC in 2022

127. As demonstrated in the table below, the TIAA GIC's poor performance continued through 2022.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2022 | Auto-Owners Insurance Company Retirement Savings Plan | 8,251 | $672,249,956 | Auto-Owners Insurance Company | 3.08% |
| | Ameritas 401(k) Retirement Plan | 3,779 | $636,210,578 | Ameritas Life Insurance | 3.30% |
| | The Standard 401(k) Plan | 4,832 | $931,024,946 | Standard Insurance | 3.22% |
| | Ford Foundation Retirement Plan | 174 | $261,575,612 | TIAA-CREF | 4.21% |
| | Transamerica 401(k) Retirement Savings Plan | 14,280 | $2,116,061,137 | Transamerica Financial Life | 3.23% |
| | **403(b) Plan** | **23,667** | **$1,716,797,093** | **TIAA GIC** | **2.06%** |
| | **401(k) Plan** | **41,991** | **$1,021,657,133** | **TIAA GIC** | **1.75%** |
| | **Defined Contribution Plan** | **10,244** | **$252,058,789** | **TIAA GIC** | **2.13%** |

128. In 2022, the TIAA GIC underperformed the Comparator GICs by 39.55% in the 403(b) Plan, 48.65% in the 401(k) Plan, and 37.50% in the Defined Contribution Plan.

129. Additionally, the TIAA GIC underperformed other GICs with similar characteristics as the TIAA GIC in 2022, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Allina 401(k) Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **403(b) Plan** | **23,667** | **$1,716,797,093** | **TIAA GIC** | **2.06%** |
| | **401(k) Plan** | **41,991** | **$1,021,657,133** | **TIAA GIC** | **1.75%** |
| | **Defined Contribution Plan** | **10,244** | **$252,058,789** | **TIAA GIC** | **2.13%** |

#### e. The TIAA GIC's Poor Performance Continued through 2023

130. As demonstrated in the table below, the TIAA GIC's poor performance continued through 2023.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Insurance Company | 3.48% |
| | Ameritas 401(k) Retirement Plan | 3,686 | $741,588,807 | Ameritas Life Insurance | 3.66% |
| | The Standard 401(k) Plan | 5,371 | $1,129,069,194 | Standard Insurance | 3.64% |
| | Ford Foundation Retirement Plan | 126 | $287,214,199 | TIAA-CREF | 4.76% |
| | Transamerica 401(k) Retirement Savings Plan | 14,168 | $2,425,600,114 | Transamerica Financial Life | 3.79% |
| | **403(b) Plan** | **23,667** | **$1,716,797,093** | **TIAA GIC** | **2.62%** |
| | **401(k) Plan** | **47,160** | **$1,603,448,159** | **TIAA GIC** | **2.35%** |
| | **Defined Contribution Plan** | **11,023** | **$275,709,669** | **TIAA GIC** | **2.56%** |

131. In 2023, the TIAA GIC underperformed the Comparator GICs by 32.23% in the 403(b) Plan, 39.21% in the 401(k) Plan, and 33.78% in the Defined Contribution Plan.

132. Additionally, the TIAA GIC underperformed other GICs with similar characteristics as TIAA GIC in 2023, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |

| | | | | | |
|---|---|---|---|---|---|
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | **403(b) Plan** | **23,667** | **$1,716,797,093** | **TIAA GIC** | **2.62%** |
| | **401(k) Plan** | **47,160** | **$1,603,448,159** | **TIAA GIC** | **2.35%** |
| | **Defined Contribution Plan** | **11,023** | **$275,709,669** | **TIAA GIC** | **2.56%** |

### f. The Comparator GICs Outperformed the TIAA GIC in 2024

133. In 2024, the Comparator GICs outperformed the TIAA GIC.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2024 | Auto-Owners Insurance Company Retirement Savings Plan | 8,950 | $864,332,421 | Auto-Owners Insurance Company | 3.40% |
| | Ameritas 401(k) Retirement Plan | 3,632 | $821,792,248 | Ameritas Life Insurance | 3.91% |
| | The Standard 401(k) Plan | 5,845 | $1,332,816,995 | Standard Insurance | 4.01% |
| | Ford Foundation Retirement Plan | 90 | $298,370,091 | TIAA-CREF | 4.59% |

| | | | | | |
|---|---|---|---|---|---|
| | Transamerica 401(k) Retirement Savings Plan | 13,910 | $2,720,479,704 | Transamerica Financial Life | 3.86% |
| | **403(b) Plan** | **22,465** | **$1,804,837,689** | **TIAA GIC** | **2.89%** |
| | **401(k) Plan** | **53,979** | **$2,131,270,226** | **TIAA GIC** | **2.59%** |
| | **Defined Contribution Plan** | **10,545** | **$290,304,776** | **TIAA GIC** | **2.84%** |

134. In 2024, the TIAA GIC underperformed the Comparator GICs by 26.91% in the 403(b) Plan, 34.50% in the 401(k) Plan, and 28.17 in the Defined Contribution Plan.

135. Additionally, the TIAA GIC underperformed other GICs with similar characteristics as the TIAA GIC in 2024, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2024 | Lexmark Savings Plan | 2,926 | $1,211,057,397 | American General Life Insurance Company | 3.38% |
| | Martignetti Companies, LLC 401(k) Plan | 1,160 | $240,540,763 | Massachusetts Mutual Life Ins. Co. | 4.35% |
| | Northeast Medical Services Profit Sharing 401(k) Plan | 1,467 | $174,979,442 | New York Life Ins. Co. | 4.58% |
| | Boyd Company 401(k) Plan | 1,762 | $204,430,246 | Standard Insurance Company | 3.21% |
| | **403(b) Plan** | **22,465** | **$1,804,837,689** | **TIAA GIC** | **2.89%** |

| | | | | | |
|---|---|---|---|---|---|
| | **401(k) Plan** | **53,979** | **$2,131,270,226** | **TIAA GIC** | **2.59%** |
| | **Defined Contribution Plan** | **10,545** | **$290,304,776** | **TIAA GIC** | **2.84%** |

136. Throughout the Class Period, the TIAA GIC in the 403(b) Plan underperformed the Comparator GICs by an average of over 33%, as demonstrated in the table below.

| **Year** | **TIAA GIC Rate of Return in the 403(b) Plan** | **Comparator GIC Average Rate of Return** | **TIAA GIC Percentage of Underperformance in the 403(b) Plan** |
|---|---|---|---|
| 2019 | 2.25% | 3.67% | 38.69% |
| 2020 | 2.06% | 3.42% | 39.77% |
| 2021 | 2.48% | 3.32% | 25.30% |
| 2022 | 2.06% | 3.41% | 39.59% |
| 2023 | 2.62% | 3.87% | 32.30% |
| 2024 | 2.89% | 3.95% | 26.84% |
| Average Underperformance during Class Period | | | 33.75% |

137. Throughout the Class Period, the TIAA GIC in the 401(k) Plan underperformed the Comparator GICs by an average of over 48%, as demonstrated in the table below.

| **Year** | **TIAA GIC Rate of Return in the 401(k) Plan** | **Comparator GIC Average Rate of Return** | **TIAA GIC Percentage of Underperformance in the 401(k) Plan** |
|---|---|---|---|
| 2019 | 1.15% | 3.67% | 68.66% |
| 2020 | 1.50% | 3.42% | 56.14% |
| 2021 | 1.94% | 3.32% | 41.57% |
| 2022 | 1.75% | 3.41% | 48.68% |
| 2023 | 2.35% | 3.87% | 39.28% |
| 2024 | 2.59% | 3.95% | 34.43% |
| Average Underperformance during Class Period | | | 48.13% |

138. Throughout the Class Period, the TIAA GIC in the Defined Contribution Plan underperformed the Comparator GICs by an average of over 35%, as demonstrated in the table below.

| Year | TIAA GIC Rate of Return in the Defined Contribution Plan | Comparator GIC Average Rate of Return | TIAA GIC Percentage of Underperformance in the Defined Contribution Plan |
|---|---|---|---|
| 2019 | 1.95% | 3.67% | 46.87% |
| 2020 | 2.13% | 3.42% | 37.72% |
| 2021 | 2.29% | 3.32% | 31.02% |
| 2022 | 2.13% | 3.41% | 37.54% |
| 2023 | 2.56% | 3.87% | 33.85% |
| 2024 | 2.84% | 3.95% | 28.10% |
| Average Underperformance during Class Period | | | 35.85% |

139. The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the TIAA GIC's dismal crediting rate.

140. Again, the specific Comparator GICs used herein had similar risk considerations based on its terms and the creditworthiness of its insurance carriers. The Comparator GICs were fully benefit-responsive.

### 2. Identical TIAA GICs with higher Crediting Rates

141. The most egregious fact in this case is that TIAA offered the same TIAA GICs at much higher crediting rates before and during the Class Period. Yet Defendant failed its fiduciary obligations to select these other identical TIAA GICs with higher crediting rates.

142. Throughout the Class Period, the Plans received a crediting rate for the TIAA GIC in the Plans that was lower than the crediting rate for identical TIAA GICs that TIAA offered in the same years. TIAA provided the following credit rates for its annuity products:

## Retirement plan and IRA accumulating annuities

Funds applied to TIAA Traditional retirement plan and IRA annuity contracts will be credited with the following total effective interest rates through February 2025.

| Total effective interest rates credited on TIAA Traditional Annuity accumulations from 10/01/2024 to 02/28/2025 | | | | |
|---|---|---|---|---|
| **Funds Applied** | **Retirement Annuity (RA), Group Retirement Annuity (GRA)** | **Retirement Choice Annuity (RC)** | **Supplemental Retirement Annuity (SRA), Group Supplemental Retirement Annuity (GSRA)** | **Retirement Choice Plus Annuity (RCP)** |
| Prior to 2006 | 4.80% | 5.05% | 4.05% | 4.30% |
| 2006-2011 | 4.35% | 4.60% | 3.60% | 3.85% |
| 2012-2019 | 4.10% | 4.35% | 3.35% | 3.60% |
| 2020-2021 | 3.65% | 3.90% | 3.00% | 3.15% |
| 01/2022-04/2022 | 4.00% | 4.25% | 3.25% | 3.50% |
| 05/2022-10/2022 | 5.25% | 5.50% | 4.50% | 4.75% |
| 11/2022-06/2023 | 6.00% | 6.25% | 5.25% | 5.50% |
| 07/2023-12/2023 | 6.50% | 6.75% | 5.75% | 6.00% |
| 01/2024-02/2024 | 6.00% | 6.25% | 5.25% | 5.50% |
| 03/2024-04/2024 | 5.25% | 5.50% | 4.50% | 4.75% |
| 05/2024-06/2024 | 5.50% | 5.75% | 4.75% | 5.00% |
| 07/2024-08/2024 | 5.25% | 5.50% | 4.50% | 4.75% |
| 09/2024 | 5.00% | 5.25% | 4.25% | 4.50% |
| 10/2024 | 4.75% | 5.00% | 4.0% | 4.25% |

* TIAA Traditional is issued through these contracts by Teachers Insurance and Annuity Association of America (TIAA)

143. One of the TIAA Stable Value options was the Retirement Choice Plus (RCP) Annuity. Its holdings are described as follows:

tiaa.org/public/pdf/RC_ComparisonGrid_8_fin.pdf

| | | Retirement Annuity (RA)/Group Retirement Annuity (GRA) | Supplemental Retirement Annuity (SRA)/Group Supplemental Retirement Annuity (GSRA) | Group Annuity (GA)/GSRA with College-Owned Endorsement (GSRA w/CO End) | Retirement Choice Annuity (RC) | Retirement Choice Plus Annuity (RCP) | TIAA Stable Value |
|---|---|---|---|---|---|---|---|
| Funding options | Fixed annuities: charges, expenses and fees | Spread based: Risk capital amounts and product costs (including amounts associated with managing and maintaining the general account collateral portfolio), liquidity charges and administrative expenses are implicit in the TIAA Traditional crediting rate spread. | | | | | Spread based and fee based: Risk capital amounts and product costs (including amounts associated with managing and maintaining the separate account collateral portfolio) are implicit in the declared crediting rate spread. Contract fees are disclosed in the contract, are collected daily and have the effect of reducing the declared crediting rate.[1] |
| Transfers/Withdrawals | Fixed annuities: Participant-directed transfers and withdrawals[2] | RA: Lump-sum withdrawals are not available from TIAA Traditional. All withdrawals and transfers from the account must be paid in 10 annual installments.<br>GRA: Lump-sum withdrawals are available from TIAA Traditional only within 120 days after termination of employment and are subject to a 2.5% surrender charge. All other withdrawals and transfers from TIAA Traditional must be paid in 10 annual installments. | Lump-sum withdrawals and transfers are available from TIAA Traditional without any restrictions or charges.<br>If funds are transferred out of TIAA Traditional and transferred back within 120 days, the amount up to the original transfer will be credited with the same interest rates that would have applied if the transfer out had not taken place. | | Lump-sum withdrawals are available from TIAA Traditional only within 120 days after termination of employment and are subject to a 2.5% surrender charge. All other withdrawals and transfers from TIAA Traditional must be paid in 84 monthly installments (7 years). | Lump-sum withdrawals and transfers are available from TIAA Traditional without surrender or charges.<br>For certain RCP contracts, 90-day equity wash applies if competing funds exist (e.g., money market, short-term bond, self-directed brokerage accounts or the TIAA Real Estate Account). Transfers from TIAA Traditional can only be made to noncompeting funds. Amount must remain in noncompeting funds for 90 days before transferring to competing funds, including transferring back to TIAA Traditional. (TIAA Contract form IGRSP-02-ACC/TIAA Certificate form IGRSP-CERT3-ACC.) | Lump-sum withdrawals and transfers are available without any surrender charges.<br>90-day equity wash applies if competing funds exist (e.g., money market, short-term bond, self-directed brokerage accounts or the TIAA Real Estate Account).<br>Transfers from TIAA Stable Value can only be made to noncompeting funds. Amount must remain in noncompeting funds for 90 days before transferring to competing funds. Transfers in may not be made for 30 days following a transfer out.[3, 4] |

144. TIAA's RCP fund is the most similar to the Plans' TIAA GIC based on the amount of liquidity. The below charts demonstrate the significant gap in crediting rates of the Plans' TIAA GIC and the RCP, TIAA's nearly identical GIC:

**403(b) Plan**

| Year | Fund in Plan | Asset Amount in Fund | Plan Crediting Rate | TIAA RCP Crediting Rate |
|---|---|---|---|---|
| 2019 | TIAA Stable Value | $27,150,246 | 2.25% | 3.60% |
| 2020 | TIAA Stable Value | $182,143,370 | 2.06% | 3.15% |
| 2021 | TIAA Stable Value | $172,436,957 | 2.48% | 3.15% |
| 2022 | TIAA Stable Value | $177,275,737 | 2.06% | 4.50% |
| 2023 | TIAA Stable Value | $165,373,764 | 2.62% | 5.75% |

**401(k) Plan**

| Year | Fund in Plan | Asset Amount in Fund | Plan Crediting Rate | TIAA RCP Crediting Rate |
|---|---|---|---|---|
| 2019 | TIAA Stable Value | $11,767,484 | 1.15% | 3.60% |
| 2020 | TIAA Stable Value | $31,029,789 | 1.50% | 3.15% |
| 2021 | TIAA Stable Value | $44,273,999 | 1.94% | 3.15% |
| 2022 | TIAA Stable Value | $65,963,311 | 1.75% | 4.50% |
| 2023 | TIAA Stable Value | $83,685,415 | 2.35% | 5.75% |

**Defined Contribution Plan**

| Year | Fund in Plan | Asset Amount in Fund | Plan Crediting Rate | TIAA RCP Crediting Rate |
|---|---|---|---|---|
| 2019 | TIAA Stable Value | $1,283,221 | 1.95% | 3.60% |
| 2020 | TIAA Stable Value | $26,275,180 | 2.13% | 3.15% |
| 2021 | TIAA Stable Value | $25,227,871 | 2.29% | 3.15% |
| 2022 | TIAA Stable Value | $24,640,428 | 2.13% | 4.50% |
| 2023 | TIAA Stable Value | $23,839,485 | 2.56% | 5.75% |

145. Based on the above charts, the Plans' crediting rates were significantly less than the TIAA RCP GIC costing tens of millions in losses to the Plans which is determined by taking the delta between the Plans' crediting rate and TIAA RCP, and then multiplying by the amount of assets.

146. Moreover, to eliminate potential outliers, one can take the average of the above TIAA crediting rates for the four stable value funds offered by TIAA during the Class Period and compare it to what the Plans received. The difference is still astonishing.

**403(b) Plan**

| Year | Fund in Plan | Asset Amount in Fund | Plan Crediting Rate | Average Available TIAA Crediting Rate |
|---|---|---|---|---|
| 2019 | TIAA Stable Value | $27,150,246 | 2.25% | 3.85% |
| 2020 | TIAA Stable Value | $182,143,370 | 2.06% | 3.43% |
| 2021 | TIAA Stable Value | $172,436,957 | 2.48% | 3.425% |
| 2022 | TIAA Stable Value | $177,275,737 | 2.06% | 4.83% |
| 2023 | TIAA Stable Value | $165,373,764 | 2.62% | 6.0% |

**401(k) Plan**

| Year | Fund in Plan | Asset Amount in Fund | Plan Crediting Rate | Average Available TIAA Crediting Rate |
|---|---|---|---|---|
| 2019 | TIAA Stable Value | $11,767,484 | 1.15% | 3.85% |
| 2020 | TIAA Stable Value | $31,029,789 | 1.50% | 3.43% |
| 2021 | TIAA Stable Value | $44,273,999 | 1.94% | 3.425% |

| | | | | |
|---|---|---|---|---|
| 2022 | TIAA Stable Value | $65,963,311 | 1.75% | 4.83% |
| 2023 | TIAA Stable Value | $83,685,415 | 2.35% | 6.0% |

**Defined Contribution Plan**

| Year | Fund in Plan | Asset Amount in Fund | Plan Crediting Rate | Average Available TIAA Crediting Rate |
|---|---|---|---|---|
| 2019 | TIAA Stable Value | $1,283,221 | 1.95% | 3.85% |
| 2020 | TIAA Stable Value | $26,275,180 | 2.13% | 3.425% |
| 2021 | TIAA Stable Value | $25,227,871 | 2.29% | 3.425% |
| 2022 | TIAA Stable Value | $24,640,428 | 2.13% | 4.83% |
| 2023 | TIAA Stable Value | $23,839,485 | 2.56% | 6% |

147. The difference in the Plans' TIAA crediting rate compared to the available TIAA stable value rates results in tens of millions of dollars in losses to the Plans and their participants during the Class Period.

148. In short, because the Plans held over $2 billion in assets under management throughout the Class Period, they had considerable leverage to bargain for higher crediting rates.

149. A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A

prudent fiduciary could have accomplished this goal by demanding higher crediting rates and/or by submitting requests for proposals to TIAA and other providers of stable value investments.

150. There is one more noteworthy benchmark to consider. According to an article by the Stable Value Institute of America ("SVIA"), "[t[he Stable Value Investment Association recently examined 135,000 retirement savings plans serving approximately 42 million participants. From January 2010 through December 2019, stable value assets in [retirement] plans grew at a compound annual rate of 4.1%."[20]

151. Here, from 2019 to 2024 the Comparator GICs had an average return of 3.61%. Thus, the average returns for the Comparator GICs for this time period is a relatively conservative return compared to the 4.1% returns observed by the SVIA. Yet, even while conservative, the Comparator GIC's average returns were higher than the TIAA GIC's average returns.

152. The TIAA GIC in the 403(b) Plan had an average return of 2.39% from 2019 to 2024. This was over 41% less than the 4.1% returns the SVIA cited for 42 million participants.

---

[20] *See* "Retirement Plans and Stable Value: By the Numbers," updated July 21, 2025, available at https://www.stablevalue.org/retirement-plans-and-stable-value-by-the-numbers/ (last visited March 9, 2026)

153. The TIAA GIC in the 401(k) Plan had an average return of 1.88% from 2019 to 2024, which was over 54% less than the 4.1% returns the SVIA cited for 42 million participants.

154. The TIAA GIC in the Defined Contribution Plan had an average return of 2.32% from 2019 to 2024, which was over 43% less than the 4.1% returns the SVIA cited for 42 million participants.

155. Thus, by selecting the TIAA GIC with underperforming crediting rates, Defendant failed to provide participants with an option that maximized the value of their investments.

156. With the significant amount of assets under management in the TIAA GIC, the losses suffered by Plan participants were devastating, costing the Plans and its participants millions of dollars. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[21]

157. In sum, the TIAA GIC in the Plans is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming

---

[21] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed April 10, 2026).

crediting rates when compared against GICs with similar riskiness provided by other comparable carriers for other retirement plans.

158. Given the Plan's substantial stable value investment assets, reasonably prudent monitoring of the TIAA GIC required Defendant to evaluate the terms and conditions of the GIC contract, research the relevant market, and test the market by, among other things, issuing requests for information and proposals from competing stable value providers. All of which they failed to do.

## VII. THE PLANS' RKA FEES DURING THE CLASS PERIOD WERE EXCESSIVE AND UNREASONABLE

159. "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.

160. As demonstrated below, Defendants failed to adequately review the Plans' RKA fees to ensure the Plans' and its participants were paying reasonable RKA fees.

### A. ERISA's Fee Disclosure Rule

161. In January 2012, the DOL issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans. This regulation is commonly

known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation."[22]

162. The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such a contract or arrangement.

163. For example, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

---

[22] *See* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf ("DOL 408(b)(2) Regulation Fact Sheet").

164. The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

165. A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

166. Instead, plan administrators have a separate obligation under 29 CFR § 2550, 404a-5 to disclose plan-related information, including fees for certain services to participants. Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)." 29 CFR § 2550.404a-5(C)(2)(ii)(B).

**B. Costs for Recordkeeping Services Vary Little Between Competing Providers for a Plan with a Substantial Number of Participants**

167. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

168. There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services

are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A. Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

B. Multi-channel participant and plan sponsor access (e.g. phone, web);

C. Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D. Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E. Participant tax reporting services (e.g., IRS Form 1099-R);

F. Participant confirmations, statements, and standard notices;

G. Plan-level reporting and annual financial package (excluding IRS Form 5500);

H. Participant education (e.g. newsletters, web articles, standard communication materials);

I. Plan consulting (e.g., preapproved document services, operational materials);

J. Plan consulting (e.g. preapproved document services, operational compliance support).

169. This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

170. The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

a. Loan processing;

b. Brokerage services/account maintenance (if offered by the plan);

c. Distribution services; and

d. Processing of qualified domestic relations orders.

171. All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

172. The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study,[23] at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."). When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases.

---

23 https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("1998 DOL Study").

***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[24]

173. In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant.***

174. Recordkeepers for large 401(k) plans such as Fidelity, Vanguard, Empower, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services).

175. Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

[24] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/.

### C. Much of the Information Regarding the Reasonableness of Fees for Recordkeeping Services is in the Sole Possession of Plan Fiduciaries

176. A plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.

177. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

178. Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though

many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[25]

179. Generally, any RFPs, if conducted, would not be made available to plan participants. The same is true for Plaintiffs here who do not have direct access to such information.

180. Additionally, documentation of fiduciary fee monitoring is generally accomplished in the form of the above-mentioned meeting minutes which Plaintiffs asked for pre-suit from the Plan administrator, but their request was denied.

181. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding the fiduciary processes related to monitoring RKA fees based upon information available to Plaintiffs, such as Rule 404a disclosures, Form 5500s filed with the DOL, market surveys, and other authority.

## D. Circumstantial Facts and Evidence Plausibly Show that the Plans Paid Unreasonable RKA Fees and/or Defendant Failed to Engage in a Prudent Process to Evaluate RKA Fees

### 1. The Plans' Recordkeeping Services Agreement with TIAA Offered Routine Services

182. A review of the Plans' recordkeeping agreement in effect during the Class Period reveals that TIAA was not providing any services beyond the standard

[25] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/.

services highlighted above in exchange for their base fee of $45 per participant. A review of the Amended and Restated Recordkeeping Services Agreement between TIAA and Hackensack in effect during the Class Period reveals that the Contracted Services are typical recordkeeping services. *See* Schedule A "Contracted Service" attached to Amended and Restated Recordkeeping Services Agreement ("Recordkeeping Agreement"). The Contracted Services listed are all for standard services for enrollment, education and consulting services, record maintenance, transaction accounting, administrator and participant communications, administering plan loans, distributions, communications regarding income tax from distributions and withdrawals, Form 5500 preparation, communications with Plan administrator regarding elective deferrals, spousal consent administration, online enrollment services, vesting calculations, hardship administration, and compliance coordinator service. *Id.*

183. As noted above, these services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.

184. Thus, TIAA was not providing any services beyond standard services in exchange for their base fee of $45 per participant.

185. The RKA services performed each year by TIAA for the Plans during the Class Period were similar so we can look at the 403(b) Plan's 2023 Form 5500,

Schedule C, the 401(k) Plan's 2023 Form 5500, and the Defined Contribution Plan's 2023 Form 5500 as an example year. The Schedule Cs list the following codes indicating the type of general services performed by the recordkeeper: 15, 17, 27, 28, 38, 50, 52, 54, 64 and 66. Below is a description of the recordkeeping codes:

> 15 – Recordkeeping and information management (computing, tabulating, data processing, etc.)
>
> 17 – Consulting (pension)
>
> 27 – Investment advisory (plan)
>
> 28 – Investment management
>
> 38 – Participant communication
>
> 50 – Direct payment from the plan
>
> 52 – Investment management fees paid indirectly by plan
>
> 54 – Sales loads (front end and deferred)
>
> 64 – Recordkeeping fees
>
> 66 – Insurance mortality and expense charge

*See* Instructions for the 2023 Schedule C (Form 5500) *available at* https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2023-instructions.pdf at 27-31. Again, the above services are not out of the ordinary from the services other national recordkeepers provide. Any fees associated with other

ancillary a la carte services performed by TIAA would be negligible because they are on a participant-by-participant basis instead of plan-wide.

186. Further, plan sponsors have great discretion and essentially no guidance in selecting the recordkeeping codes for the Schedule C. *See* Instructions for the 2023 Schedule C (Form 5500) at 30 ("Select from the list below all codes that describe both the kind of services provided and the type of compensation received. Enter as many codes as apply").

187. The service codes identified on Schedule C are often unreliable because of inconsistencies in how the codes are interpreted and applied by different service providers. For example, all recordkeepers, including TIAA through its Recordkeeping Agreement, administers plan loans. However, TIAA did not identify service code 37 – "Participant loan processing" on the Schedule C throughout the Class Period.

188. These inconsistencies regarding services provided to a plan make it difficult to compare services across different plans.

### 2. There is No Indication Defendant Negotiated to Reduce the Plans' Recordkeeping Fees During the Class Period

189. As noted above, 408(b)(2) disclosures are not available to plan participants. By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either. Accordingly, as noted above, the best way for a plan fiduciary (as

opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct an RFP.

190. At any point in the Class Period, the Plans' fiduciaries could have opted to conduct a RFP to any nationally recognized recordkeeper capable of providing lower recordkeeping fees.

191. Here, based on the fact that the Plans paid the same exorbitant amounts in recordkeeping fees throughout the Class Period, even though the general trend in the market has seen a decrease in recordkeeping fees over the last decade, there is little to suggest that Defendant conducted a RFP, or at least an effective one, at reasonable intervals to determine whether the Plans could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. Below are some of the top recordkeeping providers in the country that RFPs could have been sent to:

**2020 TOP PROVIDERS (RECORDKEEPERS)[26]**

**Top 10, by Total 401(k) Assets ($MM)**

| | | |
|---|---|---|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |
| 4 | Alight Solutions | $434,737 |
| 5 | Principal Financial Group | $322,976 |

[26] *See* https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists/.

| | | |
|---|---|---|
| 6 | Voya Financial | $211,389 |
| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

192. TIAA is considered a major recordkeeper in the marketplace similar to the above top ten recordkeepers in the marketplace.

193. These recordkeepers, including TIAA, are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena. Had the Defendant genuinely sought a competitive rate, the participants in the Plans would have benefited from a significant reduction in RKA costs.

### 3. The Plans' Recordkeeping Fees were/are Unreasonable When Benchmarked Against Other Similarly Situated Plans and Within the Context that Plan Recordkeeping Fees Should Decline as Plan Size Increases

194. Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

195. As demonstrated in the charts below, the Plans' participants were saddled with above-market administrative and recordkeeping fees throughout the Class Period.

196. The Plans' per participant RKA fees were as follows:

| 403(b) Plan | | | |
|---|---|---|---|
| **Plan Year** | **Participants** | **$PP** | **Total RKA Reported** |
| **2019** | 8,736 | $45.00 | $393,120 |
| **2020** | 27,132 | $45.00 | $1,220,940 |
| **2021** | 25,503 | $45.00 | $1,147,635 |
| **2022** | 24,738 | $45.00 | $1,113,210 |
| **2023** | 23,667 | $45.00 | $1,065,015 |

| 401(k) Plan | | | |
|---|---|---|---|
| **Plan Year** | **Participants** | **$PP** | **Total RKA Reported** |
| **2019** | 29,798 | $45.00 | $1,340,910 |
| **2020** | 34,068 | $45.00 | $1,533,060 |
| **2021** | 36,662 | $45.00 | $1,649,790 |
| **2022** | 41,991 | $45.00 | $1,889,595 |
| **2023** | 47,160 | $45.00 | $2,122,200 |

| Defined Contribution Plan | | | |
|---|---|---|---|
| **Plan Year** | **Participants** | **$PP** | **Total RKA Reported** |
| **2019** | 7,543 | $45.00 | $339,435 |
| **2020** | 11,287 | $45.00 | $507,915 |
| **2021** | 10,578 | $45.00 | $476,010 |
| **2022** | 10,244 | $45.00 | $460,980 |
| **2023** | 11,023 | $45.00 | $496,035 |

197. At all times during the Class Period a per participant fee of $45 was unreasonable. As noted above, a DOL study concluded that "[b]asic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases." Accordingly, the larger the plan, the lower the recordkeeping fee should be. To put things into perspective, when comparing retirement plan data, most publications utilize tranches. For example, the leading publication that collects 403(b) data is BrightScope/ICI. It categorizes plans in the following tranches:

EXHIBIT I.4

**Audited ERISA 403(b) Plans and the Universe of ERISA 403(b) Plans by Plan Assets**

Distribution of 403(b) plans, participants, and assets by plan assets; 2019

| | BrightScope audited 403(b) filings | | | Department of Labor 403(b) universe | | |
|---|---|---|---|---|---|---|
| Plan assets | Plans | Participants Thousands | Assets Billions of dollars | Plans | Participants Thousands | Assets Billions of dollars |
| Less than $1M | 227 | 48.1 | $0.1 | 7,193 | 209.3 | $2.6 |
| $1M to $10M | 2,583 | 705.2 | 12.3 | 7,304 | 987.9 | 26.1 |
| >$10M to $50M | 2,069 | 860.1 | 48.2 | 2,329 | 907.1 | 52.4 |
| >$50M to $100M | 518 | 433.9 | 36.5 | 536 | 450.8 | 37.7 |
| >$100M to $250M | 432 | 754.9 | 67.4 | 440 | 781.4 | 68.7 |
| >$250M to $500M | 191 | 751.8 | 67.7 | 196 | 785.6 | 69.2 |
| >$500M to $1B | 111 | 759.5 | 77.9 | 115 | 801.4 | 81.1 |
| More than $1B | 108 | 2,092.0 | 262.5 | 109 | 2,121.6 | 264.0 |
| All plans | 6,239 | 6,405.6 | 572.6 | 18,222 | 7,045.1 | 601.8 |

Note: Audited 403(b) filings generally include plans with 100 participants or more. Assets are fair market value at the year-end of the plan and include loans.

Source: BrightScope Defined Contribution Plan Database

*See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2023-04/23-ppr-dcplan-profile-403b.pdf.

198. Accordingly, the billion-dollar asset mark is significant as all plans over a billion dollars are considered in a category of their own. Additionally, plans with over 10,000 participants are also considered as in the same category.

199. Looking at recordkeeping costs for plans similar in size to the combined assets and participant size of the Plans during the Class Period shows that the Plans were paying higher recordkeeping fees than their peers.

| Recordkeeper | Plan Name | Plan Year | Assets Under Management | Participants | Schedule C Codes | Indirect Compensation | Cost Per Participant[27] |
|---|---|---|---|---|---|---|---|
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2019 | $5,675,354,000 | 42,339 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $9 |
| Great-West Life | Deseret 401(k) Plan | 2019 | $4,264,113,298 | 34,938 | 64 | Yes - $0 | $22 |
| Fidelity | The Dow Chemical Company Employees' Savings Plan | 2019 | $10,913,979,302 | 37,868 | 37 50 64 60 65 | Yes - $0 | $25 |
| Vanguard/ Prudential | Philips North America 401(k) Plan | 2019 | $4,898,009,752 | 28,428 | 15 37 50 65 99 | Yes - $0 | $25 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2019 | $5,228,805,794 | 33,116 | 37 64 65 71 | Yes - $0 | $34 |
| Fidelity | First American Financial Corporation 401(k) Savings Plan | 2019 | $1,791,281,396 | 15,246 | 37, 60, 64, 65, 71 | Yes - $0 | $35 |
| Great-West Life/ TIAA | Penn State Health 401(k) Savings Plan | 2019 | $1,646,231,456 | 15,020 | 64 | Yes - $0 | $35 |
| **TIAA** | **Hackensack 403(b) Plan** | **2019** | **$1,693,771,770** | **8,736** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$45** |
| **TIAA** | **Hackensack 401(k) Plan** | **2019** | **$257,505,458** | **29,798** | **15 17 27 28 38 52 54 64 66** | **Yes - $0** | **$45** |
| **TIAA** | **Defined Contribution Plan** | **2019** | **$258,417,423** | **7,543** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$45** |

[27] Except for the 401(k) Plan, 403(b) Plan, and the Defined Contribution Plan, and unless otherwise noted, these fees are taken from the Form 5500.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2020 | $1,051,387,744 | 19,354 | 15, 25, 50, 16, 26, 52, 21, 37, 57 | Yes - $0 | $23 |
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2020 | $6,618,601,000 | 43,691 | 15 21 25 28 37 38 49 50 52 59 62 64 65 99 | Yes - $0 | $25 |
| Prudential | Philips North America 401(k) Plan | 2020 | $5,663,746,665 | 28,348 | 15 37 50 65 99 | Yes - $0 | $25 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2020 | $5,564,538,096 | 67,149 | 37 60 64 65 | Yes - $0 | $26 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2020 | $6,148,370,238 | 35,467 | 37 64 65 71 | Yes - $0 | $30 |
| Vanguard | Kaiser Permanente Supplemental Savings and Retirement Plan | 2020 | $4,523,681,952 | 48,263 | 15 25 26 37 38 53 | Yes - $0 | $38 |
| **TIAA** | **Hackensack 403(b) Plan** | **2020** | **$1,803,107,727** | **27,132** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$45** |
| **TIAA** | **Hackensack 401(k) Plan** | **2020** | **$580,594,125** | **34,068** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$45** |
| **TIAA** | **Defined Contr. Plan** | **2020** | **$272,827,894** | **11,287** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$45** |
| | | | | | | | |
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2021 | $7,716,713,000 | 51,325 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $13 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2021 | $6,372,464,202 | 66,814 | 37 60 64 65 71 | Yes - $0 | $25 |
| Prudential | Philips North America 401(k) Plan | 2021 | $6,384,324,582 | 30,245 | 15 37 50 65 99 | Yes - $0 | $25 |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2021 | $1,706,447,554 | 15,788 | 37, 60, 64, 65, 71 | Yes - $0 | $26 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2021 | $1,341,037,601 | 10,170 | 37, 60, 64, 65, 71 | Yes - $0 | $28 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2021 | $7,166,528,576 | 41,571 | 37 64 65 71 | Yes - $0 | $33 |
| Fidelity | Fortive Retirement Savings Plan | 2021 | $1,987,784,377 | 12,758 | 37, 64, 65, 71 | No | $34 |
| **TIAA** | **Hackensack 403(b) Plan** | **2021** | **$1,921,293,403** | **25,503** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$45** |
| **TIAA** | **Hackensack 401(k) Plan** | **2021** | **$912,379,889** | **36,662** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$45** |
| **TIAA** | **Defined Contr. Plan** | **2021** | **$294,348,956** | **10,578** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$45** |
| | | | | | | | |
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2022 | $6,601,217,000 | 55,419 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $13 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2022 | $5,870,072,827 | 43,386 | 37 64 65 71 | Yes - $0 | $22 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2022 | $5,315,577,972 | 67,449 | 37 60 64 65 71 | Yes - $0 | $25 |
| Prudential | Philips North America 401(k) Plan | 2022 | $5,180,251,859 | 30,811 | 15 37 50 65 99 | Yes - $0 | $26 |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2022 | $1,475,238,032 | 16,973 | 37, 60, 64, 65, 71 | Yes - $0 | $29 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2022 | $1,099,817,927 | 11,787 | 37, 60, 64, 65, 71 | Yes - $0 | $30 |
| Fidelity | The Dow Chemical Company Employees' Savings Plan | 2022 | $9,295,343,465 | 34,710 | 37 50 64 60 65 16 | Yes - $0 | $33 |
| **TIAA** | **Hackensack 403(b) Plan** | **2022** | **$1,561,034,783** | **24,738** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$45** |
| **TIAA** | **Hackensack 401(k) Plan** | **2022** | **$1,021,657,133** | **41,991** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$45** |
| **TIAA** | **Defined Contr. Plan** | **2022** | **$252,058,789** | **10,244** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$45** |
| | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fidelity | The Dow Chemical Company Employees' Savings Plan | 2023 | $10,073,680,220 | 33,196 | 37 50 64 60 65 16 | Yes - $0 | $9 |
| T. Rowe Price | Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 2023 | $7,509,872,000 | 55,419 | 15 21 25 28 33 37 38 49 50 52 55 59 62 64 65 | Yes - $0 | $18 |
| Fidelity | Danaher Corporation & Subsidiaries Savings Plan | 2023 | $5,808,822,663 | 37,647 | 37 64 65 71 | Yes - $0 | $20 |
| Fidelity | Sutter Health 403(b) Savings Plan | 2023 | $6,529,632,096 | 71,322 | 37 60 64 65 71 | Yes - $0 | $24 |
| Prudential | Philips North America 401(k) Plan | 2023 | $5,779,286,156 | 29,489 | 15 37 50 65 99 | Yes - $0 | $27 |
| T. Rowe Price | Sanofi U.S. Group Savings Plan | 2023 | $7,800,386,450 | 26,698 | 15 37 49 | Yes - $0 | $27 |
| Fidelity | Fortive Retirement Savings Plan | 2023 | $1,915,519,824 | 13,503 | 37, 64, 65, 71 | Yes - $0 | $30 |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2023 | $1,837,546,518 | 18,163 | 37, 60, 64, 65, 71 | Yes - $0 | $32 |
| **TIAA** | **Hackensack 403(b) Plan** | **2023** | **$1,716,797,093** | **23,667** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$45** |
| **TIAA** | **Hackensack 401(k) Plan** | **2023** | **$1,603,448,159** | **47,160** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$45** |
| **TIAA** | **Defined Contr. Plan** | **2023** | **$275,709,669** | **11,023** | **15 17 27 28 38 50 52 54 64 66** | **Yes - $0** | **$45** |

200. The above chart demonstrates that for similar plans, regarding assets and participants, the Plans had one of the highest recordkeeping fees over the course of the Class Period.

201. As of the end of 2021 there were only 1,011 (0.2%) 401(k) plans with more than $1 billion in plan assets. *See* https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-401k.pdf. The Plans' $45 per participant fee from 2019 to 2023 is

almost double the average fee of $26 per participant from 2019 to 2023 for the thirty-five (35) plans listed above.

202. This vast discrepancy between the Plans' RKA fees and comparable plans existed for all years from 2019 through 2023. Indeed, the figures in the above chart are just an example of the Plans' excessive RKA fees from 2019 through 2023.

203. The Plans should have been able to obtain per participant recordkeeping fees of no more than $26 per participant, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

204. Further, because TIAA received income from the funds it maintained in the Plans, the Plans' fiduciaries should have taken these additional sources of income into consideration in considering whether RKA fees paid to TIAA were reasonable. For example, as described above, TIAA earned a significant spread from the Plans' use of TIAA GICs with low crediting rates.

205. When considered together, the fees being paid to TIAA were clearly unreasonable.

206. Given the size of the Plans' assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plans could have obtained recordkeeping

services that were comparable to or superior to the typical services provided by the Plans' recordkeeper at a lower cost.

**COUNT I**
**Breaches of Fiduciary Duty of Prudence**

207. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

208. At all relevant times, the Company ("Prudence Defendant") was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans assets.

209. As fiduciaries of the Plans, the Defendant was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plans for the sole and exclusive benefit of Plans' participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

210. The Prudence Defendant breached these fiduciary duties in multiple respects as discussed throughout this Complaint, including mismanagement of investment funds and failing to control the costs of the Plans' recordkeeping and administrative costs. Prudence Defendant did not make decisions regarding the

Plans' investment lineup based solely on the merits of each investment and what was in the interest of Plans' participants. Instead, the Prudence Defendant selected and retained investment options in the Plans despite poor performance in relation to other comparable investments.

211. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendant complied with its fiduciary obligations, the Plans would not have suffered these losses, and Plans' participants would have had more money available to them for their retirement.

212. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendant is liable to restore to the Plans all losses caused by its breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in their Prayer for Relief.

213. The Prudence Defendant knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**
**Prohibited Transaction**

214. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

215. Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in interest, or (ii) the furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(C).

216. Defendant was at all times a fiduciary to the Plans.

217. ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

218. Defendant caused the Plans to engage in the annuity transactions with actual or constructive knowledge that the transactions constituted a direct or indirect exchange of property between the Plans and TIAA.

219. Defendant also caused the Plans to engage in the annuity transactions with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between TIAA and the Plans.

220. When Defendant caused the Plans to engage in the annuity transaction, TIAA was a party in interest because, *inter alia*, TIAA, or its affiliate, was a person providing recordkeeping and trustee services to the Plan. 29 U.S.C. § 1002(14).

Defendant knew of that fact when it caused the Plans to engage in the annuity transaction.

221. These transactions occurred each time the Plans paid fees to TIAA in connection with the Plans' investments in the TIAA GIC and other proprietary options that paid revenue sharing to TIAA.

222. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendant, as a fiduciary to the Plans, is liable to restore to the Plans all losses caused by its violations of ERISA §§ 406(a)(1)(C) and (D).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendant on all claims and requests that the Court awards the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration that the Defendant has breached its fiduciary duties under ERISA;

D. An Order compelling the Defendant to make good to the Plans all losses to the Plans resulting from Defendant's breaches of their fiduciary duties, including

losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendant made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendant had fulfilled its fiduciary obligations;

E. An order requiring the Company to disgorge all profits received from, or in respect of, the Plans, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, as necessary to effectuate said relief, and to prevent the Defendant's unjust enrichment;

F. Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G. An order enjoining Defendant from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H. Other equitable relief to redress Defendant's illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I. An award of pre-judgment interest;

J. An award of costs pursuant to 29 U.S.C. § 1132(g);

K. An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L. Such other and further relief as the Court deems equitable and just.

Dated: April 17, 2026

Respectfully submitted,

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
NJ Attorney ID #02562201
James A. Maro, Esquire
PA Attorney ID #017052000
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
jamesm@capozziadler.com
Tel.: (610) 890-0200
Fax: (717) 232-3080

*Counsel for Plaintiffs and the Putative Class*